UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                                    Case No. 8:11-bk-22258-MGW
                                                          Chapter 7
Fundamental Long Term Care, Inc.,

          Debtor.

_____/

**ORDER AND MEMORANDUM OPINION ON
TRUSTEE'S MOTIONS FOR SHOW-CAUSE ORDERS**

THIS CASE came on for hearing on September 27, 2012, at 10:30 a.m., on two motions

for show-cause orders filed by the Trustee[1] and the various responses filed in opposition to those

motions.[2] In one show-cause motion, the Trustee asks the Court to direct certain law firms to

show cause why they should not be held in contempt for failing to turn over books and records

(including litigation files) belonging to the Debtor and its wholly owned subsidiary.[3] In the

second show-cause motion, the Trustee asks the Court to direct certain lawyers to show cause

why they should not be held in contempt for taking action on behalf of the Debtor's wholly

owned subsidiary in pending state court litigation.

After careful consideration of the show-cause motions, the various responses, and the

extensive oral argument that took place at the September 27 hearing, the Court concludes it is not

appropriate to hold any of the law firms or lawyers in contempt for failing to turn over the

requested books and records because the process employed by the Trustee did not provide

adequate notice or an opportunity for those lawyers or law firms to be heard before complying

_____

[1] Doc. Nos. 244 & 286.

[2] Doc. Nos. 268, 269, 354, 360, 363, 383, 384, 385 & 388.

[3] Doc. No. 244.

with the Court's previous orders requiring turnover. In fact, the Trustee concedes as much. But those parties have now been heard. And the Court concludes, after hearing those parties, that the Trustee—as the sole shareholder of the Debtor's wholly owned subsidiary—should have access to the books and records of the Debtor and its subsidiary (including any litigation files) and the right to control the subsidiary's attorney-client privilege, to the extent it exists. Accordingly, the Trustee's show-cause motions will be denied in part and granted in part.

## Background[4]

The facts of this case are complicated. And at this stage of the case, it is unnecessary to set out in detail the entire history of the case. For purposes of this Order, the following background will suffice: Before March 2006, Trans Healthcare, Inc. ("THI"), along with its sister corporation THI of Baltimore, Inc., owned a number of subsidiaries that operated nursing homes. Trans Healthcare Management, Inc. ("THMI"), formerly a THI subsidiary, provided support for nursing homes operated by other THI subsidiaries. Beginning in 2004, a series of negligence lawsuits were filed against THI and THMI by the law firm of Wilkes & McHugh.

Around March 2006, THI sold all of its stock in THMI to the Debtor. Under the terms of the sale agreement, THI agreed to fund THMI's defense of any lawsuits that were pending at the time of the sale. Three years later, THI filed for receivership in Maryland, and a receiver was appointed to liquidate and administer THI's assets (and those of its subsidiaries). As part of that process, the THI Receiver retained counsel for THMI and continued its defense of the various state court actions.

---

[4] The Court's recitation of the background of this case does not constitute findings of fact. Instead, the facts set forth in this Order, which are summarized from statements that appear in the record, merely provide context for the Court's ruling.

Ultimately, three judgments totaling over $1 billion were entered against THI and THMI in the state court actions. The Debtor was later added to one of those judgments (the judgment amount was $110 million). In December 2011, one of Wilkes & McHugh's clients filed this involuntary case against the Debtor under chapter 7. During this case, the chapter 7 trustee (the "Trustee") has sought the Debtor's books and records (as well as those of THMI), including any litigation files. The Trustee has also requested that the lawyers retained by the THI Receiver on THMI's behalf cease taking action in any of the pending state court actions.

All of this led to a series of show-cause orders requiring anyone in the possession of books and records of the Debtor and THMI to turn them over to the Trustee. When the Receiver and law firms retained by him failed to turn over litigation files (and possibly other books and records), the Trustee filed his first show-cause motion.[5] And when lawyers retained by the THI Receiver continued taking action in the pending state court litigation, the Trustee filed his second show-cause motion.[6]

The Receiver does not dispute that the Trustee should generally have access to THMI's books and records. But he claims THMI's litigation files are privileged. He also takes the position that he has the exclusive right to control the defense of any professional and general liability claims against THMI. According to the THI Receiver, he assumed the obligation of defending THMI "to ensure that no THMI obligation might by default exhaust the limited assets of the THI estate to the detriment of THI's other creditors."[7] On January 26, 2012, a state court in Maryland approved a settlement between the THI Receiver and certain third parties that

---

[5] Doc. No. 244.

[6] Doc. No. 286.

[7] Doc. No. 287 at 2.

purports to recognize the THI Receiver's right to defend THMI in the various state court actions.[8]

## Procedural History

Ordinarily, it is not the practice of the Court to recite the procedural history of a case in extensive detail, much less quote at length from hearing transcripts. But an understanding of the procedural history of the Court's show-cause orders in this case is necessary to the resolution of the motions pending before the Court.

### The Show-Cause Orders

This case was originally filed as an involuntary case under chapter 7. Because the Debtor did not respond to the involuntary petition, the Court entered its Order for Relief.[9] The Order for Relief required the Debtor to, among other things, file a list of creditors, schedule of assets and liabilities, and a statement of financial affairs within 14 days. When the Debtor failed to file the required schedules, statements, and other documents, the Court entered its original Order to Show-Cause ("Initial OSC") requiring the Debtor to show cause why it should not be sanctioned for failing to comply with the Order for Relief.[10]

On February 23, 2012, the Court held a hearing on its Initial OSC. At the February 23 hearing, which was only attended by the Trustee, her counsel, and counsel for the petitioning creditor, the Trustee's counsel orally requested that the Court order "supplemental relief" in the form of an order requiring all law firms or other persons in possession of the Debtor's files to

---

[8] *Id.* at 4.

[9] The Debtor says it did not respond to the involuntary petition because it did not receive proper notice. That issue, however, is not relevant to the current issues before the Court. Suffice it to say, the Court entered an Order for Relief.

[10] Doc. No. 14.

turn those files over to the Trustee.[11] The Court granted the requested relief "[i]n aid of the" Initial OSC (the "Order on OSC")[12] and scheduled a further hearing for March 28, 2012 to consider entry of further orders as may be appropriate.

At the March 28, 2012 hearing, again attended only by the Trustee, her counsel, and counsel for the petitioning creditor, Trustee's counsel requested that the Court modify its Initial OSC to specifically name THMI and to require the law firms (and other third parties) to turn over to the Trustee all files belonging to the Debtor and THMI.[13] At that point, the Court expressed concern about compelling turnover of potentially privileged files through an omnibus show-cause order without first providing the respondents notice and an opportunity to be heard.[14]

The Court specifically noted that the Trustee would need to initiate a contested matter to compel a law firm or other third party to comply with the Order on OSC. Trustee's counsel responded that he was in the process of preparing various motions for Rule 2004 examinations to address the Court's concerns. In the meantime, the Court granted the Trustee's request but directed Trustee's counsel to include in the order a date by which parties should file any objections to the turnover of the documents ("Order Adding THMI").[15] The Court also went ahead and scheduled a hearing for May 16, 2012 to consider any objections to turnover and the status of compliance.[16]

---

[11] Feb. 23, 2012 Hr'g Tr., Doc. No. 31 at 4-5.

[12] Doc. No. 23.

[13] Mar. 28, 2012 Hr'g Tr., Doc. No. 105 at 6.

[14] *Id.* at 7.

[15] *Id.* at 8; Doc. No. 140.

[16] Doc. No. 140.

<u>The Omnibus Discovery Order</u>

Following the March 28 hearing, Trustee's counsel filed a number of motions for Rule 2004 examination directed to law firms and individual lawyers.[17] The Debtor (who had had since appeared in the case) objected to the Trustee's various motions for Rule 2004 examinations.[18] In its objection, the Debtor requested that the Court either deny the motions for Rule 2004 examinations or defer ruling pending an adjudication of the motion to convert that the Debtor had recently filed. The Court scheduled a hearing on the Trustee's motions for Rule 2004 examinations and the Debtor's objection to those motions (as well as the Debtor's motion to convert) for April 12, 2012.[19]

Apparently because of the relatively short notice of the April 12 hearing, all but three of the subjects of the motions for Rule 2004 examinations failed to appear. The three that did appear were the law firms of Troutman Sanders and Kirkland & Ellis, and an individual, Richard Riney. Counsel for Mr. Riney offered to voluntarily produce the responsive documents, and the Trustee's counsel agreed to review the documents produced before proceeding with any further examination as to Riney. The Court later entered an order granting the motion for Rule 2004 examinations with respect to document production from Mr. Riney and otherwise denying the relief requested without prejudice.[20]

Counsel for Troutman Sanders informed the Court at the April 12 hearing that the firm had previously told Trustee's counsel it would review its files for any responsive documents, and based on that review, counsel believed that some of the Debtor's incorporation documents, as

---

[17] Doc. Nos. 42-52.

[18] Doc. No. 53.

[19] Apr. 12, 2012 Hr'g Tr., Doc. No. 109 at 60.

[20] Doc. No. 122.

well as closing documents for the sale of THMI, would be responsive.[21] Trustee's counsel clarified that the Trustee was not seeking to take a Rule 2004 examination of Troutman Sanders; she was only seeking documents relating to Troutman Sanders' formation of the Debtor and subsequent transactions involving the Debtor.[22] In response, counsel for Troutman Sanders indicated that he would work with Trustee's counsel to produce the documents he believed would satisfy the Trustee's inquiries.[23]

Specifically, Troutman Sanders' counsel stated: "What we had agreed to do is provide sort of a subset of documents to [Trustee's counsel], which we understood that he needed for preparation of the schedules, the Debtor schedules. As you might expect, the Rule 2004 laundry list of documents was quite broad."[24] Counsel for the Trustee responded: "Your Honor, the problem with—particularly with Troutman Sanders, since they were the law firm that founded the Debtor, they have a number of records that are really—that belong to the Trustee now. And those are the records that we originally sought to have turned over. . . . And we still seek to have turned over." The Court then commented: "So I think that's consistent with what we discussed earlier." And counsel for Troutman Sanders responded: "Yeah, I just wanted to be sure we are clear on that. Thank you, your honor." In due course, the Court entered an order on the motion for Rule 2004 exam directed to Troutman Sanders consistent with its oral ruling.[25]

---

[21] Doc. No. 109 at 69.

[22] *Id.* at 70.

[23] *Id*.

[24] *Id*. at 93.

[25] May 7, 2012 Order Granting Motion for 2004 Examination of Troutman Sanders, Doc. No. 129.

Later during the April 12 hearing, Trustee's counsel indicated that the intent of the Rule 2004 examinations was to obtain information to prepare the Debtor's schedules and move forward with the section 341 meeting of creditors:

> Since the goal of the 2004, at least originally, is to get the schedules prepared and be prepared to have a . . . 341 Examination, if Mr. Singerman and his client can get the schedules together, . . . we're going to need documents from some of the firms, that I will work through. But for now, we will have most of the information, assuming the schedules get prepared timely, that we can then perform—begin moving forward.
>
> So I think that getting the documents from some of the law firms we talked about this morning, plus the schedules and statement of financial affairs, and have Mr. Saacks or somebody who's competent to testify at a 341, it gets this case on the road for us.[26]

The Trustee's understanding of the purpose of the Rule 2004 examinations was seemingly confirmed when Debtor's counsel responded that he thought it was appropriate to defer ruling on the motions for 2004 exam to provide the Debtor an opportunity to file the required schedules, statement, and other documents:

> I think that, your honor, the right answer is that you should defer until I report back to Trustee's counsel and we reach agreement, or there's a need for further proceedings as to whether or not the Debtor representatives are going to be able to produce the schedules and statements. And then see if the Trustee, after reviewing that work, finds them to be acceptable.[27]

The Court ultimately decided to continue the hearing on the motions for Rule 2004 examinations—other than the motions directed to Mr. Riney and Troutman Sanders—to May 16, 2012.[28] And in its order continuing the hearing, the Court stated that in the event the Debtor filed

---

[26] Apr. 12, 2012 Hr'g Tr., Doc. No. 109 at 82.

[27] *Id*. at 83.

[28] Doc. No. 113.

its schedules and had a representative appear at the section 341 meeting of creditors, the Court would consider the impact of such filing and appearance when it further considered the Rule 2004 motions at the May 16, 2012 hearing.

The May 16 hearing on the Order Adding THMI, however, was continued to June 22, 2012. In the meantime, the Debtor moved for reconsideration of the Order Adding THMI.[29] In its motion, the Debtor argued that the Court should reconsider its ruling that THMI's attorney-client privilege had been waived because that issue had not been adjudicated by the Court at any hearing where the Debtor, the THI Receiver, Fundamental Administrative Services, or any other targeted third party was represented by counsel.[30] The THI Receiver later joined the Debtor's motion.[31] The Debtor also moved to dismiss this bankruptcy case about two weeks before the June 22 hearing.[32]

The Debtor's motion to dismiss took precedence over the other scheduled matters—in particular, the motions for Rule 2004 examinations—at the June 22 hearing, so only that motion was resolved at the hearing. The Court rescheduled the remaining matters for hearing on June 29, 2012. But before adjourning the June 22 hearing, the Court requested that Trustee's counsel and Debtor's counsel meet and confer on the remaining issues before the June 29 hearing.

During the June 29 hearing, Debtor's counsel expressed that it was clear that the purpose of the meet and confer directed by the Court at the June 22 hearing was to establish a discovery plan:

---

[29] Doc. No. 149.

[30] *Id.* at ¶ 5.

[31] Doc. No. 214. The Petitioning Creditor has moved to strike the motion for reconsideration (Doc. No. 169). The Court has not yet ruled on the Debtor's motion for reconsideration, the THI Receiver's joinder, or the Petitioning Creditor's motion to strike.

[32] Doc. No. 170.

> [I]t was at least very clear to our side that the purpose of the meet-
> and-confer was everything on today's calendar, but primarily the
> 2004 Exam and this discovery plan. . . . So at the meet-and-confer,
> we did discuss and agree to further consider and address . . . a
> number of matters. One of which was a list of witness or deponents
> that the Trustee wished to depose on topics that they would
> disclose to us on which they wished to examine these people. . . .
> We also understood that, at least that in this first round or this first
> wave of examinations, that defense counsel handling the defense of
> the State Court matters would not be the focus of the initial exams.
> So that was the focus of the meet and confer.[33]

The Court also noted during the June 29 hearing that the discovery sought from the lawyers

under the discovery plan primarily related to two types of information: the first was information

related to the defense of the personal injury or wrongful death actions. The second related to

discovery of collectability issues.[34]

   After hearing from the parties on a wide-ranging discussion of how to deal with the

pending discovery motions, the Court then directed Trustee's counsel to prepare a discovery plan

that would resolve all of the pending motions:

> It seems to me that the next step would be for Mr. Berman to take
> the laboring oar in doing an order on not granting or denying
> anything in particular but setting forth the procedures. It would be
> an order on all the pending motions for 2004 exam in dealing with
> discovery generally under 2004. . . . The order would deal with a
> first phase of discovery, which would be limited to some key
> people. As a practical matter, everybody involved in this case is a
> busy lawyer and you don't have time to drop everything and just go
> off and take 40 depositions, so that's just not going to happen, at
> least on the short-term.[35]

   The Court then went through and identified from the calendar the docket items that would

be dealt with by what came to be called the "Omnibus Discovery Order." The items that were

---

[33] June 29, 2012 Hr'g Tr., Doc. No. 204 at 20-21.

[34] *Id*. at 24-25.

[35] *Id*. at 40.

identified included the motions for Rule 2004 examinations of Matthew Box (later dealt with by separate order); Murray Forman; Alan Grochal; Backenroth, Frankel & Krinsky; Buckley & Fudge; Barry Saacks; Kristi Anderson; Toni-Jean Lisa; Christine Zack; and Forman, Zack, and Anderson.[36] The Court also identified the Debtor's motion for reconsideration of the Order Adding THMI as one of the items to be included:

> So I think that's going to deal with those sorts of issues. In that light, then that would also take care of the motion to reconsider that we're now setting up a new procedure which will supersede . . . what's currently in process.[37]

While there was a later hearing conducted on the status of the parties' joint efforts to draft an omnibus order dealing with discovery, at the end of the day, the parties were unable to reach a consensus on the form of order. Accordingly, the Court took the competing drafts and came up with its own version, which was eventually entered on July 12, 2012 (the "Omnibus Discovery Order").[38] The Omnibus Discovery Order specifically references the docket numbers being dealt with by that Order, including the various motions for Rule 2004 examinations.[39]

<u>The First Show-Cause Motion</u>

The Trustee initially served the Order on OSC on 15 law firms or individual lawyers.[40] Five of the lawyers or law firms did not respond; another five lawyers or law firms claimed not to have any responsive documents; and the remaining parties produced a limited number of

---

[36] Doc. Nos. 42, 43, 45, 46, 47, 49, 50-52 & 119.

[37] Doc. No. 204 at 53.

[38] Omnibus Discovery Order, Doc. No. 216.

[39] *Id.* The Debtor's motion for reconsideration is referenced as one of the matters considered at the June 29, 2012 hearing in the Omnibus Discovery Order, although it is not actually ruled on in the decretal provisions of the Omnibus Discovery Order.

[40] Doc. No. 34.

documents.[41] So the Trustee filed her First Show-Cause Motion asking the Court to direct the 15

lawyers or law firms to show cause why they should not be held in contempt for failing to

comply with the Order on OSC and Order Adding THMI by refusing to turn over all of the books

and records (including litigation files) belonging to the Debtor or THMI.

The Second Show-Cause Motion

On September 6, 2012 the Trustee filed her Second Show-Cause Motion directed against

certain law firms and attorneys that have been representing THMI in the state court litigation.[42]

According to the Second Show-Cause Motion, Trustee's counsel had requested that certain

lawyers retained by the THI Receiver—including the Rydberg Law Firm, P.A. and Fowler White

Boggs, P.A.—take no further action on behalf of THMI in any of the state court litigation. The

basis for the Trustee's request was that THMI is a wholly owned subsidiary of the Debtor; THMI

has no current officers or directors; and the sole basis for the authority of these attorneys to

represent THMI is the direction of the THI Receiver.

The Responses to the Show-Cause Motions

The THI Receiver and several of the lawyers and law firms that were the subject of the

Show-Cause Motions (the "Respondents") primarily raised three arguments in response to the

Show-Cause Motions.[43] First, they argue that contempt or other sanctions for failure to comply

with the Order on OSC and Order Adding THMI was inappropriate because those orders were

not directed at any particular party and, according to the Court, could not be enforced without the

Trustee initiating a contested matter. Second, the parties contend that the Court's Omnibus

---

[41] Doc. No. 244.

[42] Doc. No. 286.

[43] Doc. Nos. 268, 269, 354, 360, 363, 383, 384, 385 & 388.

Discovery Order discharged the Court's previous show-cause orders. Third, they say that the Trustee is not entitled to the litigation files because those documents are protected by the attorney-client privilege.

### Conclusions of Law

1. Should the Court grant the Show-Cause Motion and enter an order to show cause with respect to compliance with the Order on OSC?

The Court agrees with the Respondents that neither contempt nor other sanctions would be appropriate for not complying with the Court's Order on OSC. As discussed above, the procedure for issuing the Order on OSC did not provide the Respondents adequate notice of—or an opportunity to raise objections to—the relief granted in the Order on OSC. In fact, during oral argument, Trustee's counsel conceded that the Trustee was not seeking a contempt order or sanctions for that reason.[44]

Moreover, the Court agrees with the Respondents that the Initial OSC was specifically discharged by the Omnibus Discovery Order.[45] Granted, paragraph 24 of the Omnibus Discovery Order is somewhat ambiguous in that it only refers to the Initial OSC and makes no mention of the Order on OSC or the Order Adding THMI. But it is clear from the record that the Order on OSC was entered "in aid of" the Initial OSC and that the Order Adding THMI, in turn, modified the Order on OSC.[46]

And the tenor of the colloquy between the Court and counsel at various hearings reflects that a contested matter directed against individual Respondents would be required to compel compliance with the Order on OSC because of the procedural problems with the manner in

---

[44] Instead, the Trustee says she simply wants any books and records of the Debtor or its wholly owned subsidiary, THMI, including their legal files.

[45] Doc. No. 216 at ¶ 24.

[46] Doc. No. 140.

which the show-cause orders were entered.[47] Other references in the record also indicate a

general understanding that the orders to show cause were superseded by the Omnibus Discovery

Order.[48] As a consequence, the show-cause motion is not the proper vehicle for seeking

production of the books and records of the Debtor or THMI (including any litigation files).

Simply denying the First Show-Cause Motion, however, leaves the parties without

guidance as to one of the key issues raised by the Respondents in their various responses: to what

extent does the Trustee—as representative of the Debtor's bankruptcy estate (which owns 100%

of the shares of THMI)—have the right to control THMI's activities (including the right to waive

any applicable attorney-client privilege)? It is this question that is really at the heart of the

difficulties being encountered by the Trustee in conducting her investigation under the Omnibus

Discovery Order.[49] The Court will now address that issue so that the Trustee's investigation may

continue.

> 2.    Who Controls THMI?

The substantive issue impeding the Trustee's ability to obtain information and documents

concerning THMI is the assertion of the attorney-client privilege on behalf of THMI by parties

who have no legal capacity as officers, directors, or even shareholders of THMI.[50] The Trustee

for the Debtor (THMI's parent) has waived the attorney-client privilege on THMI's behalf. The

THI Receiver, however, contends the Trustee has no power to waive the privilege on behalf of

---

[47] Mar. 28, 2012 Hr'g Tr., Doc. No. 105 at 6-7.

[48] June 29, 2012 Hr'g Tr., Doc. No. 204 at 51-53; Sep. 17, 2012 Hr'g Tr., Doc. No. 373 at 41-42.

[49] Doc. No. 216 at ¶ 15.

[50] The THI Receiver, Respondents, and the Debtor all have raised the attorney-client privilege on behalf of THMI in one form or another. But the THI Receiver took the lead in advancing this argument on behalf of himself, the Respondents, and the Debtor. For ease of reference, then, the Court will simply refer to the THI Receiver in analyzing the legal issues raised by the parties.

THMI because only THMI's shares are property of the bankruptcy estate, and ownership of shares in a corporation—even 100% of the shares—does not carry with it the right to control the activities of THMI. According to the Receiver, the right to control the corporation is vested in a board of directors acting through its duly appointed officers.

Since the Trustee is not an officer or director, she cannot—at least according to the Receiver—exercise control over THMI. If the Trustee wishes to control THMI's activities, the Receiver says she must elect herself to THMI's board. That, of course, would subject the Trustee to whatever fiduciary duties—and corresponding liabilities—arise by virtue of her status as a director of a defunct company. Alternatively, under Delaware law, a majority shareholder who exercises control over corporate affairs owes a fiduciary duty to the Corporation.[51] In either case, then, the Trustee assumes a fiduciary duty to THMI, which will create an "automatic conflict" between the Trustee's duty to the Debtor and her duty to THMI.

As succinctly stated in one of the responses in support of the Receiver's argument, "[b]ankruptcy jurisprudence would be turned on its head if every corporate bankruptcy automatically subjected all the wholly-owned subsidiaries to bankruptcy court jurisdiction."[52] The Court agrees with this general statement. In the normal world of corporate governance, the mere fact that THMI is a wholly owned subsidiary of the Debtor is insufficient to permit the Trustee to control THMI. As a general proposition, separate corporate entities are treated separately—even in bankruptcy. And as the cases cited by the THI Receiver point out, the filing

---

[51] Doc. No. 388 at 3.

[52] *Id.* at 4.

15

of bankruptcy alone does not permit the Court to disregard corporate separateness.[53] But the cases by the THI Receiver are distinguishable in one profound way.

The cases cited by the Respondents involve corporations that were operating entities with boards of directors and management. Corporate formalities were being observed by these corporations. And as a result, they were accorded the status that goes with observing corporate formalities. But that is not the situation before the Court in this case. THMI has not been an active corporation since 2006. It has no assets. It has no officers or directors. For several years, it appears that THMI's only activity has been the defense of certain personal injury and wrongful death lawsuits.

And that leads to the fundamental problem with the Receiver's analysis: courts have—contrary to the implicit premise of the Receiver's argument—disregarded the corporate form when equity requires. In *Wofford v. Wofford*, for instance, the Florida Supreme Court, as early as 1937, considered whether a court of equity could look beyond the legal fiction of a corporate entity and decree a sale of the corporation in an "effort[] to do justice between litigants."[54] In coming to that conclusion, the Florida Supreme Court looked back to cases from California and New Jersey—the New Jersey decision dating back to 1898.[55] Based on its review of *Wofford* and other authorities, the Court is persuaded that it can look beyond the corporate form in this case.

---

[53] *Bendix Home Sys., Inc. v. Hurston Enters.*, 566 F.2d 1039, 1042 (5th Cir. 1978); *In re Holywell Corp.*, 118 B.R. 876, 879 (S.D. Fla. 1990); *In re Tower Automotive, Inc.*, 356 B.R. 598 (Bankr. S.D.N.Y. 2006); *Equity Broad. Corp. v. Shubert (In re Winstar Commc'ns, Inc.)*, 284 B.R. 40, 51 (Bankr. D. Del. 2002).

[54] *Wofford v. Wofford*, 176 So. 499, 504 (Fla. 1937).

[55] *Id.*

In fact, Bankruptcy Code § 105 grants the Court that very type of power. Under § 105, bankruptcy courts can exercise broad powers in administering a bankruptcy case.[56] This power, of course, is not limitless. For example, § 105 does not authorize the Court to override explicit other mandates of the Bankruptcy Code.[57] But that is not what the Court is doing here. To the contrary, the Court is looking beyond the corporate form to give effect to this Court's jurisdiction under 28 U.S.C. § 1334(e) and Bankruptcy Code § 541.

This brings us back to the question of whether it should be the Trustee or Receiver who controls THMI. Fortunately, *Wofford* provides guidance for resolving that issue. In deciding whether to look beyond the corporate form, the *Wofford* court observed that a "corporation is in fact a collection of individuals who, in the case of modern private corporations, really own its property and carry on the corporate business" and that "the idea of a corporation is a mere fiction of the law introduced for convenience in conducting business in this privileged way."[58]

For that reason, courts will generally "not forget that the stockholders are the real and substantial beneficiaries" when looking beyond the corporate form.[59] In other words, the shareholders are the real parties at interest. And in this case, the Trustee is the sole shareholder. Since the Trustee is the sole shareholder, she should be the one who controls THMI.

> a.      Is There Any Privilege to Waive?

Before considering whether it is the Trustee or Receiver who can waive the attorney-client privilege, the Court must first determine whether there is any privilege at all. "There is no

---

[56] 11 U.S.C. § 105.

[57] *Norwest Bank Worthington v. Ahler*, 485 U.S. 197, 206 (1988) (explaining that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code").

[58] *Wofford*, 176 So. at 505.

[59] *Id.*

doubt that the attorney-client privilege extends beyond the death of a natural person."[60] But the

same is not necessarily true for dissolved corporations. In fact, several courts have held that a

dissolved corporation does not have the right to assert the attorney-client privilege.[61] The same is

true for companies that—while not formally dissolved—have ceased operating.[62] Courts holding

that a dissolved or defunct corporation cannot assert the attorney-client privilege have generally

relied on two rationale.

First, when a company is dissolved or defunct, there is no one left to assert (or waive) the

privilege.[63] As the Supreme Court recognized in *Commodity Futures Trading Commission v.

Weintraub*,[64] the authority to act on behalf of a corporation belongs to the officers and directors.

In *Weintraub*, the Court determined that a trustee is most analogous to management in the

bankruptcy context. So the trustee controls the privilege. But what about where the corporation

has been dissolved or the company ceases operating? There no longer is a board of directors or

any remaining officers to assert or waive the privilege. Nor is there anyone who is analogous to

management.  Because there is no management or anyone analogous to management, there is no

one who can assert or waive the attorney-client privilege.

Second, and perhaps more important, the rationale for extending the attorney-client

privilege to corporations does not apply to dissolved corporations.[65] The Supreme Court provides

an excellent discussion of the application of the attorney-client privilege to corporations in

---

[60] *Swindler & Berlin*, 524 U.S. 399, 405-06 (1998).

[61] *City of Rialto v. United States*, 492 F. Supp. 2d 1193, 1200-01 (C.D. Cal. 2007).

[62] *Gilliland v. Geramita*, 2006 WL 2642525, at *3-4 (W.D. Pa. 2006).

[63] *Id.* at *3.

[64] 471 U.S. 343, 348-49 (1985).

[65] *Gilliland*, 2006 WL 2642525, at *3.

*Weintraub*. There, the Court notes that it is well settled that the privilege applies to corporations as well as individuals and that the purpose is to promote full and frank communications between lawyers and their clients.[66] But the *Weintraub* Court noted that application of the attorney-client privilege to corporations presents special problems.

For instance, a corporation cannot, as the *Weintraub* Court notes, speak directly to its lawyers.[67] For that reason, it cannot directly waive the privilege when it is in its best interest. And what if control of the corporation changes? In that case, the authority to assert or waive the privilege passes to new management when control of the company passes to new management.[68] Finally, the privilege protects the corporation—not the individual employees. An individual, by contrast, can act for himself, always retains control over the privilege, and personally enjoys the protections of the privilege. Courts have relied on those distinctions in determining that the attorney-client privilege dies with the corporate entity:

> Once the corporate entity has ceased to exist, or no longer exists with any officers and directors who have authority to assert or waive the privilege protection, some courts have concluded that the privilege dies with the entity, unlike the privilege held by an individual, and the lawyer can be compelled to disclose confidential communications previously protected by the entity's privilege.[69]

Applying those rationale here weighs in favor of finding that there is no attorney-client privilege for THMI to assert or waive. After all, THMI appears to be administratively dissolved. Regardless of whether it is formally dissolved, all of the parties concede that the company has

---

[66] 471 U.S. at 348.

[67] *Id.*

[68] *Id.* at 349.

[69] *City of Rialto*, 492 F. Supp. 2d at 1199 (quoting Paul Rice, *Attorney-Client Privilege in the United States*, § 2.5 (2d ed. 2007)).

not done business since 2006. There does not appear to be anybody around to speak on THMI's

behalf. So there is no one left to assert or waive the privilege on THMI's behalf. And how does

THMI benefit from asserting the privilege?

In fact, the only conceivable party who benefits from assertion of the privilege is THI's

receivership estate. The Receiver has taken the position that he has defended THMI because

some of the nursing home bad acts occurred while THMI was THI's wholly owned subsidiary,

and a judgment against THMI may deplete THI's estate. It is true that some courts have held that

a dissolved or defunct corporation may be able to assert the privilege where good cause exists.[70]

But the fact that a judgment against THMI may deplete the receivership estate of its former

parent does not constitute good cause—particularly when weighed against the Trustee's interest

in investigating the Debtor's affairs. On the whole, then, the Court concludes that THMI does not

have an attorney-client privilege to assert.

### b.    If There is a Privilege, Who Can Waive It?

But even if the privilege did not die along with THMI, the Trustee should be the one to

assert it. As mentioned above, there is no one left from THMI to assert the privilege. The

attorneys for THMI appear to be taking direction from the THI Receiver. So that leaves only two

people who could assert the privilege on THMI's behalf: the Trustee and the Receiver.[71] The

Receiver says the Trustee cannot waive the privilege for the same reason he says she cannot

control THMI: she is merely the sole shareholder and not an officer or director of THMI.

---

[70] *Gilliland*, 2006 WL 2642525, at *4.

[71] Conceivably, THMI's current counsel could contend that they have a duty to raise this issue on THMI's behalf.
But at least one court has ruled a defunct corporation's former counsel has no duty—and, in fact, lacks the ability—
to assert the privilege on behalf of the defunct corporation. *Gilliland*, 2006 WL 2642525, at *4.

For the reasons set forth above, that argument is unconvincing. The Trustee, as THMI's sole shareholder, is the real party in interest. As a consequence, she should control the privilege. Importantly, that outcome is consistent with the Court's reasoning in *Weintraub*. Recall that the *Weintraub* Court concluded that the trustee should control the privilege of an insolvent corporation because the trustee is the "actor whose duties most closely resemble those of management."[72]

But more important to this case, the Court reasoned that allowing someone other than the trustee to control the privilege—in this case, the Receiver—would frustrate an important goal of bankruptcy:

> In seeking to maximize the value of the estate, the trustee must investigate the conduct of prior management to uncover and assert causes of action against the debtor's officers and directors. It would often be extremely difficult to conduct this inquiry if the former management were allowed to control the corporation's attorney-client privilege and therefore to control access to the corporation's legal files. To the extent that management had wrongfully diverted or appropriated corporate assets, it could use the privilege as a shield against the trustee's efforts to identify those assets. The Code's goal of uncovering insider fraud would be substantially defeated if the debtor's directors were to retain the one management power that might effectively thwart an investigation into their own conduct.[73]

Here, allowing the Receiver to control the privilege will impede the Trustee's ability to investigate the conduct of prior management and uncover and assert causes of action. At the same time, it would provide minimal value to the Receiver. To be sure, the Receiver has a right to be concerned that disclosure of its litigation files to the nursing home claimants would be

---

[72] 471 U.S. 343, 351-52 (1985).

[73] *Id.* at 353-54.

harmful. But the Court can impose restrictions on the Trustee's access to the litigation files—i.e., she cannot disclose them to the nursing home claimants—that would adequately protect the Receiver's interest, while at the same time permit the Trustee to perform a proper investigation. For all of those reasons, the Trustee should have access to THMI's litigation files, subject to reasonable limitations imposed by the Court.

3.    Concern That Trustee Will Allow Inflated Tort Claims against THMI by Default.

One of the themes of the various objections and responses to the Show-Cause Motions is the concern that the Trustee is intent on allowing inflated tort claims to be entered against THMI by default.[74] There is also concern that the Show-Cause Motion will allow the lawyers representing the nursing home plaintiffs to gain access to privileged or work product information and use that information against the Debtor (and THI or THMI) in the pending state court actions. Both of those concerns are understandable.

Neither concern, however, warrants denying the Trustee access to THMI's litigation files. The Court agrees that allowing defaults to be entered against THMI or sharing privileged information or work product with counsel for the nursing home plaintiffs would not be in the interest of the bankruptcy estate or its creditors. But this Court ultimately has the power to oversee the Trustee's performance of her duties under Bankruptcy Code § 704. The Court cannot assume for purposes of determining the merits of the positions of the parties that the Trustee will act in a way that is inconsistent with the faithful performance of her duties and obligations to the estate and its creditors. Likewise, the Court can deal with the disclosure of information in the litigation files as it often does in tailoring discovery and the disclosure of confidential information to ensure legitimate interest of parties are protected.

---

[74] *See, e.g.*, Doc. No. 383 at 2.

**Conclusion**

For the reasons set forth above, it is not appropriate to impose sanctions against any party for failing to comply with the Court's Initial OSC, Order on OSC, or Order Adding THMI because the process employed by the Trustee did not provide adequate notice or an opportunity for those lawyers or law firms to be heard before complying with the Court's previous orders requiring turnover. But those parties have now been heard. And the Court concludes, after hearing those parties, that the Trustee—as the sole shareholder of the Debtor's wholly owned subsidiary—should have (i) access to the books and records relating to the Debtor and its subsidiary (including any litigation files); and (ii) the right to control THMI activities (including the right to assert any attorney-client privilege, to the extent it exists, on THMI's behalf).

Accordingly, it is

**ORDERED:**

1.      The Trustee may file separate motions under Rule 2004 requesting copies of any books and records (including litigation files) relating to the Debtor or THMI that are in the custody, possession, or control of the party named in the individual motion for Rule 2004 examination. The Court will enter an order granting such motions giving the Respondents 14 days to comply with the order or file an objection to the requested production on any appropriate ground, other than the assertion of THMI's attorney-client privilege.

2.      The Court will leave for further consideration the issue of whether and to what extent the Trustee may furnish any information produced in response to a motion for Rule 2004 examination to any party in interest.[75] This Order, however, is without prejudice to any party to

---

[75] In this respect, Bankruptcy Code § 704 (7) provides that "unless the court orders otherwise, [the trustee shall] furnish such information concerning the estate and the estate's administration as is requested by a party in interest."

request that any information in THMI's litigation files pertaining to the defenses being asserted in the state court negligence actions be maintained confidential.

3.      The Court will schedule a further status conference to discuss a proposed form of order resolving the Trustee's Show-Cause Motions and to determine which of the remaining motions heard on September 27 can be disposed of or require further hearing.

**DONE** and **ORDERED** in Chambers at Tampa, Florida, on _ October 09, 2012

Michael G. Williamson
United States Bankruptcy Judge

Copies to be provided by CM/ECF service.