UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                                      Case No. 8:11-bk-22258-MGW
                                                            Chapter 7
Fundamental Long Term Care, Inc.,

        Debtor.
_____/

## MEMORANDUM OPINION ON
## ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT ISSUES

Where a lawyer represents two clients in the same case, communications between the lawyer and one client ordinarily are not confidential as to the other client. Here, Trans Health Management, Inc. ("THMI") and Trans Health, Inc. ("THI") have been represented by the same lawyers in a series of wrongful death cases. THMI is the wholly owned subsidiary of the Debtor in this case, and THI is THMI's former parent. THI (and later its court-appointed receiver) retained counsel to defend THMI, which has been defunct since it was sold to the Debtor in 2006, in the wrongful death cases.

The Court recently ruled that the Chapter 7 Trustee has the right to control THMI's defense in those cases (including its rights with respect to the attorney-client privilege and attorney work product). Since that ruling, the Trustee has retained new counsel to defend THMI. And now she wants the litigation files (including all attorney-client communications and work product) from the lawyers representing THI and THMI so her new lawyers can prepare THMI's defense. She also wants the files to investigate potential breach of fiduciary duty and malpractice claims she believes she has against THI's Receiver and THMI's former counsel for letting more than $1 billion in judgments get entered against THMI in three of the wrongful death cases. But

the law firms representing THI and THMI have refused to turn over their litigation files based on the attorney-client privilege, common interest doctrine, and work product doctrine.

This Court concludes that the Trustee (standing in THMI's shoes) is entitled to invoke the co-client exception to the attorney-client privilege to obtain communications relating to the defense of the wrongful death cases. THI (and the Receiver) owed THMI a fiduciary duty in retaining counsel for THMI and directing its defense under an indemnification agreement.[1] And under that indemnification agreement, THMI had the right to access the litigation files for the wrongful death cases. So the Trustee is entitled to any communications between THI (or the Receiver) and the law firms representing THI and THMI—as well as communications between those law firms and Fundamental Administrative Services—relating to the defense of the wrongful death cases.

The Trustee is also entitled to communications among the parties to a January 5, 2012 settlement agreement (as well as their lawyers) relating to the defense of those claims. It is true that THI (and the Receiver) share an interest in avoiding liability for wrongful death (and collection of any wrongful death judgment) with parties to the settlement agreement. But THMI shares the same interest in avoiding liability (although not collection on any liability). So while the common interest exception applies to protect communications between parties to the settlement agreement relating to the defense of the wrongful death cases from disclosure to third

---

[1] At least a part of the Court's analysis in this Memorandum Opinion relies on the existence of an indemnification agreement between THI and THMI under a stock purchase agreement. The Court understands that THI Holdings, LLC (THI's parent company) and the Receiver now dispute that they are obligated to indemnify THMI under the stock purchase agreement. There can be no serious doubt, however, that the Debtor, Fundamental Administrative Services, THI, and the Receiver all previously operated under the assumption that THI was obligated to indemnify THMI under the stock purchase agreement. Doc. Nos. 105, at p. 5; 109 at p. 17; 204 at pp. 9-10; 318 at pp. 27-29; 373 at p. 59; 402 at pp. 127-29; 599 at p. 124. Since the applicability of the co-client exception is based on whether the Receiver had an *objectively* reasonable belief that his communications to counsel would be kept private from THMI, the Receiver is estopped from disputing the indemnification obligation for these purposes. But the Court is not making any findings regarding the enforceability of that agreement for purposes of the separate adversary proceeding that has been filed, styled *Scharrer, et al. v. THI Holdings, LLC*, Adv. Pro. No. 13-ap-00155.

parties, it cannot be used to protect those communications from disclosure to THMI. The Court cannot conceive of any basis for THMI's attorneys to refuse to share communications they received from other parties with identical interests in the wrongful death cases.

Nor can THMI's former counsel use the work product doctrine to deny the Trustee access to the litigation files (including attorney work product). THMI, as a former client, is presumptively entitled to its files. And courts uniformly agree that an attorney cannot invoke the work product doctrine to deny its client access to its files. There is no policy reason to deviate from that well-accepted rule.

There are, however, two significant limitations on the Court's ruling. First, the Trustee is only entitled to communications or litigation files *relating to the defense of the wrongful death cases*. The Trustee is not entitled to any communications regarding this bankruptcy case or any matters unrelated to the defense of the wrongful death cases. Second, the Trustee and her attorneys cannot disclose to any third parties (specifically the plaintiffs in the wrongful death cases) any communications they receive under the co-client exception—other than agents assisting the Trustee and THMI's new counsel.

**Background**

<u>The Parties</u>

Before March 2006, THI owned a number of subsidiaries that operated nursing homes throughout the United States. THMI, which was a THI subsidiary at the time, provided "back office" administrative support for the nursing homes operated by the other THI subsidiaries. In March 2006, THI sold its stock in THMI to the Debtor under a stock purchase agreement.[2] After it was sold to the Debtor, THMI stopped providing support to the other THI subsidiaries and

---

[2] Although the stock sale closed in late March 2006, the actual stock purchase agreement is dated February 28, 2006.

eventually was administratively dissolved. THMI is currently a defunct entity. In 2009, THI (and its remaining subsidiaries) filed for receivership in Maryland, and the Maryland state court appointed a receiver to manage THI's assets.[3]

The Wrongful Death Cases

Two years before the stock purchase agreement, the first of six wrongful death claims—*Estate of Jackson*—was filed.[4] Two more cases—*Estate of Nunziata* and *Estate of Jones*—were filed before the stock purchase agreement.[5] Another two cases—*Estate of Webb* and *Estate of Sasser*—were filed just months after the stock purchase agreement.[6] And the last case—*Estate of Townsend*—was filed in 2009.[7] THI and THMI were co-defendants in all but the *Nunziata* case (just THMI was a defendant in that case).

Retention of Counsel

Before filing for receivership, THI retained the following firms to represent it and THMI in the wrongful death cases: Mancuso & Dias, P.A.; Quintairos Prieto Wood & Boyer, P.A.; Fudge & McArthur, P.A.; and Schutt Schmidt Noey. From the record, it appears that Mancuso & Dias initially represented THI and THMI in the *Jackson*, *Nunziata*, and *Sasser* wrongful death cases. That firm later withdrew, and Quintairos Prieto substituted in as counsel in those cases in 2007. Fudge & McArthur represented THI and THMI in the *Jones* case, and Schutt Schmidt

---

[3] Alan Grochal is currently THI's court-appointed receiver.

[4] *Jackson* was filed on July 30, 2004.

[5] *Nunziata* was filed on December 23, 2005; *Jones* was filed on March 20, 2006.

[6] *Webb* was filed on June 16, 2006; *Sasser* was filed on September 6, 2006.

[7] *Townsend* was filed January 29, 2009.

4

represented both parties in the *Webb* case.[8] Once THI filed for receivership in 2009, the Receiver took over the defense of THI and THMI in the wrongful death cases.

<u>Defense of the Wrongful Death Cases</u>

What happened next is—like most of this case—subject to much disagreement. The Receiver says that the Maryland state court set two claims bar dates and that none of the wrongful death plaintiffs filed a claim in THI's receivership proceeding. The Receiver also says that counsel for the wrongful death plaintiffs (Wilkes & McHugh) represented to him on three separate occasions that none of his clients would be filing a claim in the receivership proceeding. Based on that, the Receiver says he stopped his defense of the six wrongful death claims—on behalf of both THI and THMI—around April 2010. Not surprisingly, the wrongful death plaintiffs tell a completely different version of the story. The Court need not resolve that dispute now. What is clear is that in April or May 2010, Quintairos Prieto withdrew as counsel in the *Jackson*, *Nunziata*, and *Sasser* cases.[9]

About three months later, the first of three judgments was entered in the wrongful death cases: on July 22, 2010, a $110 million judgment was entered against THI and THMI in the *Jackson* case after an "empty chair" trial. The plaintiff in *Jackson* then initiated proceedings supplementary against a number of entities (including the Debtor) in an attempt to collect on the judgment.[10] And on September 13, 2011, a $110 million judgment was entered against the

---

[8] Schutt Schmidt also represented THI and THMI in the *Townsend* case. But that case was not filed until after THI went into receivership.

[9] It also appears that Fudge & McArthur withdrew as counsel in the *Jones* case and that Schutt Schmidt withdrew in the *Townsend* and *Webb* cases.

[10] Those entities (or individuals) included: the Debtor; Murray Forman; General Electric Capital Corporation; GTCR Golder Rauner LLC; Fundamental Administrative Services, LLC; Fundamental Long Term Care Holdings, LLC; GTRCR Fund VI, LP; Leonard Grunstein; Troutman Sanders, LLP; Rubin Schron; THI of Baltimore, Inc.; Ventas, Inc.; and Ventas Realty Limited Partnership.

Debtor and others in the proceedings supplementary. Then, in November 2011, the *Jackson* plaintiff and the plaintiffs in the remaining wrongful death cases sought an order from a state court in Miami-Dade County declaring that they had timely filed claims in the Maryland receivership proceedings.[11]

All of this led the Receiver to enter into an agreement with the other parties to the *Jackson* proceedings supplementary regarding the defense of the wrongful death cases. Under that agreement, entered into on January 5, 2012, Fundamental Administrative Services agreed to defend the Receiver against any claims arising out of the wrongful death cases. Fundamental Administrative Services also agreed to defend and oppose the wrongful death cases outside of the receivership proceeding. To fund that defense, Fundamental Administrative Services agreed to deposit $800,000 into escrow. General Electric Capital Corporation also agreed to deposit another $200,000. That settlement agreement was later approved by the Maryland receivership court.

Immediately after entering into the settlement agreement, the Receiver retained the Rydberg Law Firm to represent THMI in the *Nunziata* case. A default as to liability had already been entered in that case, and the jury trial on damages was set for January 9, 2012. So the Rydberg firm filed a notice of appearance in that case and moved to vacate the default. But the *Nunziata* plaintiff objected. The *Nunziata* court struck the Rydberg firm's notice of appearance, and the case ultimately proceeded to a jury trial on damages, where the jury—after an "empty chair" trial—entered a $200 million judgment against THMI on January 11, 2012.

---

[11] THI had previously filed an action in Miami-Dade County to domesticate its receivership order. That action was styled *Trans Health, Inc. v. Bonnie Creekmore*, Case No. 09-11513-CA-20. In the *Creekmore* case, the Receiver sought to stay the *Jackson*, *Nunziata*, *Sasser*, *Townsend*, and *Webb* cases. The state court apparently denied the Receiver's request. The *Jackson* plaintiff later moved for a determination in the *Creekmore* case that it had timely filed a claim in the Maryland receivership proceeding.

One month later, the last—and by far the largest—of the three judgments was entered in the wrongful death cases. On February 10, 2012, a $900 million final judgment was entered against THI and THMI in the *Webb* case. Since the *Webb* judgment was entered, the Receiver has retained the Rydberg firm and Fowler White Boggs Banker to appeal the *Nunziata* judgment on behalf of THMI and the *Webb* judgment on behalf of THI and THMI. Although the underlying final judgment in *Jackson* has not been appealed, the one-year deadline for vacating it has been stayed pending this case. As of the date of this Memorandum Opinion, then, final judgments totaling just over $1 billion have been entered against THI and THMI in three of the wrongful death cases (two of which are on appeal), and three cases remain pending.

The Bankruptcy Case

Just three months after obtaining a $110 million judgment against the Debtor in the *Jackson* proceedings supplementary, the *Jackson* plaintiff initiated this involuntary case under chapter 7. The Debtor did not respond to the involuntary petition, so the Court entered an order for relief requiring the Debtor to file a list of creditors, schedules of assets and liabilities, and a statement of financial affairs within 14 days.[12] When the Debtor failed to comply with the order for relief, the Court entered a series of show-cause orders that—when taken together—required all law firms or other persons in possession of any books and records belonging to the Debtor or THMI (including any litigation files) to turn them over to the Trustee.[13]

The Trustee served the show-cause orders on 15 law firms or individual lawyers.[14] Five of the lawyers or law firms did not respond; another five lawyers or law firms claimed not to

---

[12] Doc. No. 6. The Debtor says it did not respond to the involuntary petition because it did not receive proper notice. That issue, however, is not relevant to the current issues before the Court. Suffice it to say, the Court entered an order for relief.

[13] Doc. Nos. 14, 23 & 105.

[14] Doc. No. 34.

have any responsive documents; and the remaining parties produced a limited number of documents.[15] So the Trustee asked the Court to (i) direct the 15 lawyers or law firms to show cause why they should not be held in contempt for refusing to turn over all of the books and records (including litigation files) belonging to the Debtor or THMI; and (ii) direct the Rydberg firm and Fowler White (as well as other law firms and attorneys that had been representing THMI in the wrongful death cases) to take no further action on THMI's behalf.[16]

The Receiver objected that the Trustee was not entitled to THMI's litigation files because those documents were protected by the attorney-client privilege.[17] The Receiver also argued that he—and not the Trustee—was entitled to control THMI's defense in the wrongful death cases. Thus, the Court was faced with a novel issue in resolving the Trustee's show-cause motions: who was entitled to control the defense of a defunct and administratively dissolved non-debtor entity (THMI) in the wrongful death cases.[18]

On the one hand, while the Trustee owned 100% of the stock in THMI, she was not an officer or director of the company, and more importantly, THMI was not in bankruptcy—only its parent company was. According to the Receiver, the mere fact that THMI was a wholly owned subsidiary of the Debtor was not sufficient to allow the Trustee to control THMI. On the other

---

[15] Doc. No. 244.

[16] Doc. Nos. 244 & 286.

[17] Doc. Nos. 268, 269, 354, 360, 363, 383, 384, 385 & 388. The Receiver and law firms also raised two procedural issues: First, they argued that contempt or other sanctions for failure to comply with the Court's show-cause orders was inappropriate because those orders were not directed at any particular party and, according to the Court, could not be enforced without the Trustee initiating a contested matter. Second, the parties contended that an Omnibus Discovery Order entered by the Court discharged the Court's previous show-cause orders.

[18] The Court also considered whether THMI had the right to assert the attorney-client privilege. The Court initially concluded that THMI no longer had an attorney-client privilege to assert because it was defunct and administratively dissolved. But the Court went on to consider who had the right to control THMI's defense. And as part of that analysis, the Court assumed the attorney-client privilege could be raised.

hand, the Receiver had no ownership interest in THMI; it only had the apparent obligation to control THMI's defense under an indemnification agreement.

The Court's October Memorandum Opinion[19]

In choosing between the Trustee and the Receiver, the Court looked to *Wofford v. Wofford* for guidance.[20] In *Wofford*, the Florida Supreme Court—in the context of considering whether a court of equity could look beyond the legal fiction of a corporate entity and order the sale of the corporation "to do justice between litigants"—cautioned that courts should "not forget that the stockholders are the real and substantial beneficiaries" when looking beyond the corporate form.[21] Because the Trustee was THMI's sole shareholder, the Court decided she should be the one—as between her and the Receiver—to control THMI's defense (including the right to assert any privilege).[22]

Accordingly, the Court authorized the Trustee to file Rule 2004 motions requesting copies of any books and records (including litigation files) relating to the Debtor or THMI. Under the Court's ruling, any person responding to a Rule 2004 motion was given 14 days to comply with the order or file an objection to the requested production on any ground, other than the assertion of THMI's attorney-client privilege. The Trustee filed her Rule 2004 motions seeking documents from the various law firms that represented THI and THMI in the wrongful

---

[19] *In re Fundamental Long Term Care, Inc.*, 2012 WL 4815321 (Bankr. M.D. Fla. Oct. 9, 2012).

[20] *Id.* at *8 (citing *Wofford v. Wofford*, 176 So. 499, 504 (Fla. 1937)).

[21] *Id.*

[22] *Id.*

death cases, and the Receiver and the law firms have objected based on THI's—not THMI's—attorney-client privilege.[23]

Issues Now Before Court[24]

The Trustee says THI cannot assert the attorney-client privilege against THMI because THI and THMI are co-clients, and under the co-client exception to the attorney-client privilege, communications between one client and its lawyer are not confidential as to another co-client. The Receiver acknowledges that THI and THMI were co-clients—and, therefore, THMI is entitled to any communications between THI and the lawyers defending the wrongful death cases—up until THMI was sold to the Debtor in March 2006. After it was sold, however, THMI went out of business, and at that point, the Receiver says THMI was no longer a client of the law firms that had been defending the wrongful death cases.

And the Receiver says that any law firms retained after THMI was sold only had an attorney-client relationship with THI or the Receiver (depending on when the firm was retained) because no one from THMI was around to consent to those firms' representation. Plus, the Receiver says that THMI became adverse to THI once the Trustee was appointed in this bankruptcy case. So, at a minimum, any communications between THI (or the Receiver) and its counsel are not subject to the co-client exception after that point. And any communications among the firms and the parties impleaded in the *Jackson* proceedings supplementary are protected from disclosure under the common interest doctrine and a joint defense agreement.

---

[23] The Trustee's production requests and the objections to them are the subject of various motions that the Court has taken under advisement. Doc. Nos. 444, 451, 467, 472, 575, 591 & 631.

[24] The issues relating to the attorney-client privilege, common interest doctrine, and work product doctrine have been thoroughly briefed by the parties. In fact, the Trustee, Receiver, law firms, and creditors have filed a total of 34 memoranda and cited over 80 cases for the Court's consideration.

Finally, the Receiver says the law firms' litigation files are protected by the work product

doctrine, which THMI cannot waive over the law firms' objections.

### Conclusions of Law[25]

The threshold issue to be addressed is whether THMI had an attorney-client relationship

with any of the law firms that represented it after it was sold to the Debtor. It is unclear whether

the Receiver believes THMI was a client of any of those firms. On the one hand, the Receiver

argues in his attorney-client privilege brief that THMI had no attorney-client relationship with

any of the law firms after it was sold to the Debtor.[26] That view was also echoed by the Rydberg

firm in its filings.[27] On the other hand, the Receiver appeared to concede at a February 12, 2012

hearing that THMI "technically" was the client of the firms that represented it in the wrongful

death cases.[28] In the end, the Receiver really has no choice but to concede THMI was a client of

those firms.

### THMI is a client

The argument that THMI was not a client hinges on three facts: (i) at least some of the

engagement letters say that the Receiver "retained" the firm to represent THMI; (ii) either THI or

the Receiver—and not THMI—paid for the legal services; and (iii) there was no one around

from THMI after 2006 to consent to the law firms' representation. But none of those facts—

whether considered alone or together—demonstrate that THMI was not a client.

---

[25] This Court has jurisdiction over this contested matter under 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E) & (O).

[26] Doc. No. 613 at 3-6.

[27] Doc. No. 610 at 5-6.

[28] Doc. No. 686 at p. 58, l. 25 – p. 59, l. 5.

To begin with, whether THI or the Receiver technically retained the law firms or paid their fees is not determinative. The key issue is whether the law firms provided legal services to THMI. In *The Florida Bar v. King*, the Florida Supreme Court considered whether an attorney had entered into an attorney-client relationship with Charles Baldwin in connection with a lawsuit involving Baldwin and his company.[29] There, the attorney wrote a letter to opposing counsel saying that he had been retained by Baldwin; talked to opposing counsel on the phone to secure an extension of time to file an answer on "behalf of [his] client"; and filed an answer and counterclaim identifying himself as Baldwin's attorney. According to the Florida Supreme Court, filing pleadings in a pending lawsuit on Baldwin's behalf and advising opposing counsel that he represented Baldwin was sufficient to establish an attorney-client relationship in *King*.[30]

And the facts in *King* are analogous to those in this case. There really is no dispute that various law firms held themselves out to Wilkes & McHugh as representing THMI. Nor is there any dispute that the law firms appeared—or attempted to appear—on THMI's behalf in the wrongful death cases.[31] More importantly, the law firms that did appear as THMI's counsel in the wrongful death cases actually took action on THMI's behalf in those cases.[32] So there is no question that the law firms—like the lawyer in *King*—filed pleadings and held themselves out as THMI's counsel in the wrongful death cases.

The only real argument left is that THMI somehow did not consent to the legal services provided by the law firms. That is why the Receiver principally—although not exclusively— relies on *Zych v. Jones* for his claim that no attorney-client relationship was created between

---

[29] *The Florida Bar v. King*, 664 So. 2d 925, 926 (Fla. 1995).

[30] *Id.* at 926-27.

[31] Doc. No. 624-2.

[32] *Id.*

THMI and the law firms.[33] In *Zych*, which was a malpractice action, Stanley Zych alleged that J. Edward Jones (an attorney) initially filed an appearance on his behalf in an earlier automobile accident case at the request of George F. Mueller & Sons, Inc.—Zych's employer.[34] Zych apparently told the attorney that he would let him know if he wanted the attorney to represent him. Because Zych never did so, the attorney did not appear on his behalf at trial, and a default judgment was ultimately entered against him. The issue in *Zych* was whether an attorney-client relationship existed between Zych and the attorney.

The Illinois appellate court held no attorney-client relationship existed. At the outset, the court noted that "where an attorney appears of record for a party, it is presumed that the appearance is authorized."[35] But the court went on to note that the presumption is not conclusive and that it may be rebutted by evidence to the contrary. The evidence to the contrary in that case was that (i) there was no retainer agreement between Zych and the attorney in the first place; and (ii) Zych never arranged for the attorney's services later.[36] The fact that Mueller & Sons (Zych's employer) asked the attorney to represent Zych was not sufficient to create an attorney-client relationship because Mueller & Sons was not acting as Zych's agent. The lack of an agency relationship between Zych and Mueller & Sons was critical to the court's analysis.[37]

And that is what distinguishes this case from *Zych*. To be sure, this case is similar to Zych in that a third party (THI or the Receiver depending on the timing) requested that various law firms represent THMI in the wrongful death cases, and like in *Zych*, no THMI officer,

---

[33] Doc. No. 613 at 5.

[34] *Id.* (citing *Zych v. Jones*, 406 N.E.2d 70 (Ill. Ct. App. 1980)).

[35] *Zych*, 406 N.E.2d at 74.

[36] *Id.*

[37] *Id.*

director, or employee agreed to those services at the time.[38] But there is one critical difference. Here, THI and the Receiver—unlike the employer in *Zych*—were obligated to retain counsel on behalf of THMI and direct its defense in the wrongful death cases.[39]

The Receiver has conceded at various stages of this case that THI was contractually obligated to retain counsel to defend THMI in the wrongful death cases and that he was directing THMI's defense.[40] That contractual duty to defend presumably arose out of the stock purchase agreement, which contains an indemnification provision obligating THMI to retain counsel and defend THMI against any claim relating to any facility operated by a THI subsidiary. Later, when THI went into receivership, the Receiver assumed THI's indemnity obligations.[41] Because THI and the Receiver had the right to retain counsel for THMI and direct its defense, this case is different than *Zych*.

The situation in this case is—as the Receiver suggests—more analogous to cases where an insurer had an obligation to retain counsel to defend its insured.[42] The problem with that analogy—at least from the Receiver's perspective—is that it is well settled that the insured is the client even where an insurer retains (and pays for) counsel to represent the insured.[43] In fact, one

---

[38] THMI must have consented to the lawyers THI initially retained to defend THMI before it was sold to the Debtor because the Receiver concedes THMI had an attorney-client relationship with the law firms defending it before 2006. There would be no reason THMI would have to consent to those lawyers continuing to represent it after it was sold to the Debtor. So that leaves for the Court's consideration THMI's relationship with the law firms that were retained by THI or the Receiver after THMI was sold.

[39] Doc. Nos. 187-2; 624-1 at § 6(c); 624-2 & 624-3.

[40] Doc. Nos. 187-2; 624-2 & 624-3.

[41] *Id.*

[42] Doc. No. 613 at 5.

[43] *U.S. Specialty Ins. Co. v. Burd*, 833 F. Supp. 2d 1348, 1353 (M.D. Fla. 2011) (explaining "it is clear that under Florida law, a tripartite relationship normally exists between the insurer, the insured, and the law firms defending it before represent the insured"); *Hartford Ins. Co. of the Midwest v. Koeppel*, 629 F. Supp. 2d 1293, 1299 (M.D. Fla. 2009) (explaining that decisions in most jurisdictions "reflect the view that a 'tripartite relationship' exists among the

of the cases cited by the Receiver for the proposition that the attorney-client privilege extends to the client's agents (discussed later in this Opinion) states that "when an insurer accepts the defense obligations of its insured, certain interests of the insured and insurer essentially merge" and that those "common interests bar . . . the attorney-client privilege from attaching to the communications among the attorney, the insurer, and the insured."[44] So the Receiver really had no choice but to concede at the February 12, 2013 hearing that the insured is the client in that context.[45]

And so it is in this context, too. The fact that counsel retained by THI and the Receiver actually held themselves out as THMI's counsel, appeared in court on THMI's behalf, and rendered legal services to THMI is sufficient to establish an attorney-client relationship. That, frankly, is the easy part. The hard part is deciding what the consequence of that relationship is. The Trustee contends the existence of the attorney-client relationship, alone, permits her access to otherwise confidential communications between THI and the Receiver and law firms retained to represent them and THMI. According to the Trustee, once it is established that THI and THMI are co-clients, then she is entitled to all communications between THI (and the Receiver) and counsel defending THI and THMI in the wrongful death cases.

That is because the co-client exception to the attorney-client privilege ordinarily holds that where a lawyer represents two clients in the same case, communications between the lawyer

---

insurer, insured, and counsel, with both insurer and insured as co-clients of the firm in the absence of a conflict of interest") (quoting *Gen. Sec. Ins. Co. v. Jordan, Coyne & Savits, LLP*, 357 F. Supp. 2d 951, 956 (E.D. Va. 2005)); *Pine Island Farmers Coop. v. Erstand & Riemer, P.A.*, 649 N.W.2d 444, 449 (Minn. 2002) (explaining "it is clear that in an insurance defense scenario, defense counsel has an attorney-client relationship with the insured").

[44] *Liberty Mut. Fire Ins. Co. v. Kaufman*, 885 So. 2d 905, 908 (Fla. 3d DCA 2004).

[45] Doc. No. 686 at p. 58, l. 25 – p. 59, l. 5.

and one client are not confidential as to the other client.[46] The co-client exception applies

regardless of whether both parties are present when the communication is made.[47] Here, for

instance, communications between THI and counsel for THI and THMI ordinarily would not be

privileged as to THMI even if THMI was not present—provided the co-client exception applies.

But the Receiver says it should not apply here because THI and the Receiver had a reasonable

expectation that their communications to lawyers retained to represent THI and THMI would be

kept confidential.

The Trustee (standing in THMI's shoes) is
entitled to invoke the co-client exception

According to the Receiver, the rationale behind the co-client exception is that co-clients

have no expectation that their confidences concerning a joint matter will be kept secret.[48] In this

case, the Receiver says he did not have any reason to believe his communications to his lawyers

would be disclosed to THMI because THMI was defunct and administratively dissolved. There

was literally no one around from THMI at the time the communications were made. And the

Receiver proffers in his filings that he specifically intended that any communications regarding

the wrongful death cases (and the implication of those cases in this bankruptcy case) would be

kept confidential from not only the wrongful death plaintiffs—but the Trustee as well. Besides,

the Receiver says the co-client exception should not apply because THMI did not—nor could

it—participate in any of the communications since it was defunct and administratively dissolved.

On this last point, the Trustee cites *Ashcraft & Gerel v. Shaw*, a Maryland appellate court

decision, for the proposition that even a client who did not (or could not) participate in

---

[46] *In re Ginn-LA St. Lucie, Ltd.*, 439 B.R. 801 (Bankr. S.D. Fla. 2010).

[47] *Transmark, USA, Inc. v. State Dep't of Ins.*, 631 So. 2d 1112, 1116-17 (Fla. 1st DCA 1994). *Ashcraft & Gerel v. Shaw*, 728 A.2d 798, 812-13 (Md. Ct. App. 1999).

[48] Doc. No. 613 at 7.

confidential communications is entitled to assert the co-client exception.[49] In that case, the court-appointed guardian of a severely retarded child wanted the files of a law firm retained by the child's mother to represent her and her child in two tort actions. The law firm argued that the co-client exception did not apply because the child never participated in any of the communications. The *Ashcraft* court held that the co-client exception applied regardless of whether both clients were present or participated in the communications.[50] While *Ashcraft* is certainly persuasive, it does not address the Receiver's first point: his claim that he had a reasonable expectation that his communications would be kept private under the unique facts of this case.

The real issue raised by the Receiver—even if not precisely articulated—is whether there are any circumstances where one co-client has a reasonable expectation that any communications made outside the presence of the other client will remain confidential. Not surprisingly, there are no cases involving facts identical to those in this case (i.e., where one of the co-clients has been defunct during most of the representation). There are, however, several decisions discussing whether it is reasonable, taking into account all of the relevant circumstances, for a party to invoke the co-client exception.

Perhaps the most instructive case is the Northern District of California's decision in *Sky Valley Limited Partnership v. ATX Sky Valley, Ltd.*[51] In that case, Sky Valley claimed that communications it made to a law firm in connection with seeking legal advice were privileged. ATX, however, claimed it was entitled to those communications because it was a co-client with

---

[49] Doc. No. 621 at 7 (citing *Ashcraft*, 728 A.2d at 812-13).

[50] *Ashcraft*, 728 A.2d at 812-13.

[51] *Sky Valley Ltd. P'ship v. ATX Sky Valley, Ltd.*, 150 F.R.D. 648 (N.D. Cal. 1993); *see also FDIC v. Ogden Corp.*, 202 F.3d 454, 461-62 (1st Cir. 2000).

Sky Valley regarding a development project. At the outset, the *Sky Valley* court observed that whether a client relationship has been established under California law depends on the setting.[52]

For instance, California courts generally have an expansive view of "client" when determining whether statements made by a person interviewing a lawyer in connection with seeking legal advice are privileged. California courts have felt a more expansive view is appropriate in that context because of society's interest in encouraging people to seek legal advice. In other areas, California courts have employed a more constrained analysis when considering whether a party is a "client."[53]

One of those areas is the co-client exception. According to the *Sky Valley* court, California courts have been reluctant to simply consider—as the Trustee seems to suggest is appropriate here—whether two people have sought legal advice from a particular lawyer in deciding whether the co-client exception applies:

> [C]ourts have not been satisfied simply to ask whether each of two persons sought legal service or advice from a particular lawyer in her professional capacity. Instead, the courts have focused on whether it would have been reasonable, taking into account all the relevant circumstances, for the person who attempted to invoke the joint client exception to have inferred that she was in fact a "client" of the lawyer.[54]

The *Sky Valley* court then outlined a number of factors courts should consider in deciding whether the co-client exception applies.

Those factors can be broken down into two categories: (i) the relationship between the attorney and the client seeking to invoke the co-client exception; and (ii) the relationship

---

[52] *Sky Valley*, 150 F.R.D. at 651.

[53] *Id.*

[54] *Id.*

between the co-clients. Factors relating to the relationship between the attorney and the client seeking to invoke the co-client exception include: the conduct of the attorney and that client; the reason the lawyer and that client communicated; the substance of the communications between the lawyer and that client; the capacity in which the lawyer and that client communicated; whether that client played any role in the decision-making process; and whether that client was free to ignore the attorney's advice.[55]

Factors relating to the relationship between the undisputed client and the client seeking to invoke the co-client exception include: the conduct of the parties towards each other; the terms of any contractual relationship between the parties; the existence of any fiduciary relationship between the parties; the extent to which the parties communicated with each other; the extent to which there were private communications between either of the parties and counsel (and the extent to which the other parties knew about those communications); the nature and legitimacy of each party's expectations about its ability to access the other party's communications with counsel; the extent to which the parties' interests were in common and the relationship between those common interests and the parties' communications with counsel; the existence of any actual or potential conflicts between the parties; and, if a dispute arose, whether counsel represented both parties with respect to that dispute.[56] The *Sky Valley* Court applied those factors and ultimately determined that the co-client exception did not apply in that case.

In refusing to apply the co-client exception, the court primarily focused on three factors. First, the parties were on "decidedly unequal footing with respect to contractually based rights of access to information from one another." Second, the parties were not fiduciaries. Third, there

---

[55] *Id.* at 652.

[56] *Id.* at 652-53

was more than a de minimis possibility that a conflict would arise between the parties.[57]

According to the court, the existence of a contractual right of access to information and a

fiduciary relationship were the central factors in cases previously upholding the applicability of

the co-client exception.[58]

In fact, those two factors—the right to access information and the existence of fiduciary

relationship—are at the core of the co-client exception:

> The principal purposes of the joint client exception to the privilege
> . . . are (1) to prevent unjustifiable inequality in access to
> information necessary to resolve fairly the disputes that arise
> between parties who were in the past joint clients--when the
> disputes relate to matters that were involved in the joint
> representation, and (2) to discourage abuses of fiduciary
> obligations and to encourage parties to honor any legal duties they
> had to share information related to common interests.[59]

Because those factors were not present in *Sky Valley*, the court declined to apply the co-client

exception.

Here, many (if not all) of the factors relating to the relationship between the attorney and

the client asserting the co-client exception (the Trustee standing in THMI's shoes) are not

present because—as the Receiver correctly notes—THMI was defunct and, as a consequence,

had no communications with any of the lawyers. Likewise, many of the factors relating to the

relationship between THI (or the Receiver) and THMI appear to weigh in favor of finding that

the co-client exception does not apply.

For instance, THI and the Receiver certainly contend that all of the conversations they

had with counsel were "private" since there was nobody from THMI around. THI and the

---

[57] *Id.* at 659-663.

[58] *Id.*

[59] *Id.* at 653.

Receiver also had private conversations with lawyers that were not representing THMI. THI and the Receiver would undoubtedly argue—and the Court would be inclined to agree—that the absence of any communications weighs in favor of finding that the co-client exception does not apply. But the three most significant factors weigh in favor of finding the co-client exception does apply.

First, THI (or the Receiver) owes THMI a fiduciary duty with respect to defending the wrongful death cases. THI retained counsel to represent THMI in the wrongful death cases based on its obligations—whether real or perceived—under an indemnification provision contained in the stock purchase agreement. THI's (or the Receiver's) indemnification obligation is analogous to an insurer's duty to defend an insured. And in Florida, an insurer's duty to defend rises to the level of a fiduciary duty.[60] That duty obligates an insurer to use the same degree of care and diligence in defending an insured as an insurer of ordinary care and prudence should exercise in the management of its own business.[61]

Second, the parties in this case contractually agreed to equal access to information. Under the stock purchase agreement, THI is obligated to make its books and records relating to the wrongful death cases available to THMI.[62] There is no limitation on THMI's right to access that information. So it is reasonable to conclude that THI could not have reasonably believed that its litigation files would be kept confidential from THMI.

Third, THI and THMI's interests in the wrongful death cases are nearly—if not completely—identical. In particular, both THI and THMI have the exact same interest in not

---

[60] *U.S. Fire Ins. Co. v. Hayden Bonded Storage Co.*, 930 So. 2d 686, 691 (Fla. 4th DCA 2006) (explaining that "an insurer's duty to defend rises to the level of a fiduciary duty").

[61] *Id.*

[62] Doc. No. 624-1 at § 6(c)(vi)(c).

being held liable for the deaths of the plaintiffs in the wrongful death cases. And the Receiver

has said he undertook THMI's defense on behalf of THI because THI and THMI both have the

same interest in not being held liable for wrongful death. In fact, the Receiver has expressed his

bewilderment that the Trustee does not want him to direct THMI's defense—using the same

firms he previously retained to represent both parties—given the interests are identical and the

defense was at no cost to the estate.[63] The Receiver even conceded in his attorney-client privilege

brief that the parties have identical interests in defending the wrongful death cases.[64]

The Receiver argues, however, that the Court should overlook the fact that THI's

interests are identical to THMI's interests in the wrongful death cases because the Trustee has

been adverse to the Receiver since she was appointed in this case. No one could dispute that the

Trustee and Receiver are adverse with respect to turnover of the wrongful death litigation files

(and just about everything else in this bankruptcy case). But that does not mean THI and THMI's

interests in the wrongful death litigation are adverse. In an effort to show they are adverse, the

Rydberg firm argues in its brief on the attorney-client privilege that the "Trustee demanded

control of the [*Webb*] appeal solely so she could disavow trial counsel's representation of

THMI."[65]

Yet, the Rydberg firm notes right before that claim that the "Trustee *adopted every*

*argument made by the Receiver*, except the one about trial counsel's right to represent THMI."[66]

In actuality, the Trustee adopted THI's arguments that the trial court deprived the parties of their

due process by striking the Rydberg firm's notice of appearance and leaving the parties without

---

[63] Doc. No. 402 at p. 126, l. 8 – p. 129, l. 3.

[64] Doc. No. 613 at 8.

[65] Doc. No. 610 at 9.

[66] *Id.* (emphasis added).

counsel (and, since they are corporations, the ability to appear) at trial—subject to the Trustee's

caveat that she could not take a specific position regarding the facts relating to the trial court's

decision to exclude counsel from the trial.[67] Nothing in the Trustee's brief, as far as the Court

can see, "disavows trial counsel's representation of THMI."

And in any case there is no record evidence that the Trustee is somehow "throwing in the

towel" on its defense of the wrongful death cases. The Rydberg firm's concession that the

Trustee adopted virtually all of the Receiver's arguments on appeal belies that point. At best (or

worst), the Receiver and the Trustee disagree over trial strategy in the underlying cases. But that

does not change the fact that THI and THMI both have the identical interest in not being held

liable for wrongful death. And even if there were some conflicts between THI and THMI

regarding strategy, that does not preclude a finding that the co-client exception applies.

In the end, the Court must decide whether—taking into account all the relevant

circumstances—it is reasonable for the Receiver to claim he had a reasonable expectation of

privacy sufficient to preclude application of the co-client exception. Given that THI and THMI

have the same interest in not being held liable for wrongful death, THI (and the Receiver)

retained counsel to defend THMI in those cases, THI and the Receiver owe THMI a fiduciary

obligation in directing the defense of the wrongful death cases, and THI agreed to make its books

and records relating to the wrongful death cases available to THMI, the Court concludes that the

Receiver did not have a reasonable expectation of privacy with respect to communications

regarding the defense of the wrongful death cases. Accordingly, the Trustee is entitled to invoke

---

[67] Doc. No. 610-2.

the co-client exception with respect to communications relating to the defense of the wrongful death cases.[68]

Significantly, allowing the Trustee to invoke the co-client exception with respect to those communications is—contrary to the Receiver's assertion—completely consistent with public policy. As the *Sky Valley* court observed, the purpose of the co-client exception is to (i) prevent unjustifiable inequality in access to information necessary to fairly resolve disputes that arise between parties who were in the past joint clients; and (ii) to discourage abuses of fiduciary obligations and to encourage parties to honor any legal duties they had to share information related to common interests.[69]

Here, the Court has ruled that the Trustee has the right to control THMI's defense in the wrongful death cases. The Trustee has since retained new counsel for THMI. THMI's new counsel cannot be expected to prosecute the pending appeals in *Nunziata* or *Webb* or defend the remaining wrongful death cases without access to prior counsel's files. Nor should THI or the Receiver be permitted to use access to the litigation files as leverage for the Receiver to regain control of THMI's defense in the wrongful death cases. To allow THI (or the Receiver) to deny the Trustee access to the litigation files would ultimately deprive THMI's of its contractual right to access that information and sanction an abuse of THI's fiduciary obligations to THMI.

Moreover, the Trustee reasonably believes that the estate may have a breach of fiduciary duty claim against THI and the Receiver for directing THMI's counsel to withdraw from the wrongful death cases (and possibly a malpractice claim against the law firms for actually

---

[68] Those law firms include: Fowler White; Fudge & McArthur; Mancuso & Dias; Quintairos Prieto; Romaguerra Baker; the Rydberg firm; Schutt Schmidt; Wilkins Tipton; and Wisler Pearlstine.

[69] *Sky Valley Ltd. P'ship v. ATX Sky Valley, Ltd.*, 150 F.R.D. 648, 653 (N.D. Cal. 1993).

withdrawing).[70] And the only way for the Trustee to investigate those potential claims is to review the litigation files. Yet, the Trustee will be denied access to her sole—or at least primary—means of investigating those claims if she cannot invoke the co-client exception. So depriving THMI access would thwart the Trustee in fulfilling her statutory duties.

The co-client exception only applies to communications<br>about the defense of the wrongful death cases

The same is not true for communications between THI (or the Receiver) and counsel for THI and THMI regarding matters unrelated to the defense of the wrongful death cases. That is not to say the Trustee would not benefit from having communications regarding a number of other issues, such as the Receiver's strategy (or the strategy of other parties) for: opposing collection in the *Jackson* proceedings supplementary; opposing turnover of the litigation files; or retaining control of THMI's defense in the wrongful death cases. She may even be able to develop some causes of action on behalf of the estate from reviewing those communications. But depriving the Trustee of those communications would not thwart the purpose behind the co-client exception.

That is because THMI does not have any contractual right to access information related to those matters (or any matters unrelated to the defense of the wrongful death cases). Nor do THI and the Receiver owe THMI a fiduciary duty with respect to anything other than the defense of the wrongful death cases. So denying the Trustee access to information unrelated to the wrongful death cases would not result in an unjustifiable inequality of access to information or encourage abuses of fiduciary obligations. For all of those reasons, the Court concludes that the Receiver had a reasonable expectation that his communications with THI and THMI's lawyers

---

[70] The Court, of course, is not finding that such claims exist or have merit. If the Receiver's allegations regarding the conduct by Wilkes & McHugh are true, then no such claims may exist. But based on the record before the Court, those claims are certainly plausible.

regarding matters other than the wrongful death cases would be confidential. As a consequence, the Trustee's invocation of the co-client exception is *limited* to communications *relating to the defense of the wrongful death cases*.

Communications between Fundamental Administrative Services and
counsel defending THI and THMI are included within the co-client exception

Since the Trustee (standing in THMI's shoes) is entitled to invoke the co-client exception, that means she is entitled to any communications between THI (or the Receiver) and any of the law firms defending THI and THMI in the wrongful death cases. The Trustee is also entitled to invoke the co-client exception with respect to any communications between Fundamental Administrative Services and the law firms representing THI and THMI relating to the defense of the wrongful death cases.

Ordinarily, communications between Fundamental Administrative Services and the law firms representing THI and THMI would not be privileged. That is because Fundamental Administrative Services is not a client of those firms. But there is no question that the attorney-client privilege extends not only to the lawyer giving advice but to any persons assisting the lawyer in providing legal services.[71] It also extends to the client's in-house counsel and agents.[72]

Here, the record reflects that Fundamental Administrative Services provided "back office administrative services," including in-house counsel services, to nursing facility operators nationwide, including THI. And those services included facilitating the defense of the wrongful death cases on behalf of THI (and the Receiver) and THMI. Moreover, the Receiver specifically argues that Fundamental Administrative Services acted as its agent with respect to the wrongful

---

[71] *Miller v. Haulmark Transp. Sys.*, 104 F.R.D. 442, 445 (E.D. Pa. 1984); *Liberty Mut. Fire Ins. Co. v. Kaufman*, 885 So. 2d 905, 909 (Fla. 3d DCA 2004).

[72] *Kaufman*, 885 So. 2d at 909.

death cases. As a consequence, those communications between Fundamental Administrative

Services and the lawyers defending THI and THMI are protected from disclosure to third parties

but available to THMI under the co-client exception since Fundamental Administrative Services

was facilitating THMI's defense as well as THI's defense.

The analysis is slightly different, however, with respect to communications between THI

(or the Receiver) and Fundamental Administrative Services. THI and the Receiver have

proffered evidence that Fundamental Administrative Services effectively served as THI's in-

house counsel. Under federal law, the attorney-client privilege "attaches where the client is a

corporation, and where the attorney is in-house counsel."[73] Therefore, communications strictly

between THI (or the Receiver) and Fundamental Administrative Services are not subject to the

co-client exception.

The common interest doctrine

But what about communications among the parties to the January 5, 2012 settlement

agreement and their counsel relating to the wrongful death cases or other matters?[74] In some

cases, lawyers for THI and THMI may have had conversations with the lawyers representing

Fundamental Long Term Care Holdings, LLC. Or perhaps parties to the *Jackson* proceedings

supplementary may have had conversations among themselves. Ordinarily, those

communications would not be privileged because they are not confidential communications

between a lawyer and client. Nevertheless, the Receiver says those communications between the

---

[73] *Shipes v. BIC Corp.*, 154 F.R.D. 301, 304 (citing *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981) and 8 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2017 at 135-36 (1970)).

[74] The parties to the settlement agreement are: the Receiver; General Electric Capital Corporation; Fundamental Administrative Service, LLC; THI of Baltimore, Inc.; Fundamental Long Term Care Holdings, LLC; Murray Forman; Leonard Grunstein; Rubin Schron; Ventas, Inc.; GTCR Golder Rauner, LLC; GTCR Fund VI, LP; GTCR Partners VI, LP; GTCR VI Executive Fund, LP; GTCR Associates VI; Edgar D. Jannotta, Jr.; and THI Holdings, LLC.

parties to the settlement agreement (and their lawyers) are protected from disclosure under the common interest doctrine.[75]

The common interest doctrine—like the co-client exception—is typically referred to as an exception to the attorney-client privilege waiver rule rather than a privilege itself.[76] The "need to protect the free flow of information from attorney to client logically exists whenever multiple clients share a common interest about a legal matter."[77] The common interest doctrine protects that free flow of information by providing that "clients and their respective attorneys sharing common litigation interests may exchange information freely among themselves without fear that by their exchange they will forfeit the protection of the [attorney-client] privilege."[78]

There is some dispute over how similar the interests must be for the common interest doctrine to apply.[79] In *Duplan Corp. v. Deering Milliken, Inc.*, for example, the court suggested the legal interests must be identical. The Restatement (Third) of the Law Governing Lawyers, by contrast, says the interests "need not be entirely congruent."[80] In *In re Teleglobe Communications*, the court, in explaining the split of authority, noted it need not resolve that dispute.[81] Here, too, the Court need not decide how similar the interests must be.

That is because the interests of all of the parties to the January 5, 2012 settlement agreement are identical with respect to the defense of the wrongful death cases. After all, the

---

[75] Doc. No. 613 at 8; Doc. No. 614 at 2-8.

[76] *United States v. Gumbaytay*, 276 F.R.D. 671, 673-74 (M.D. Ala. 2011).

[77] *United States v. Almeida*, 341 F.3d 1318, 1324 (11th Cir. 2003).

[78] *In re Indiantown Realty Partners Ltd. P'ship*, 270 B.R. 532 (Bankr. S.D. Fla. 2001) (quoting *Visual Scene, Inc. v. Pilkington Bros.*, 508 So. 2d 437, 440 (Fla. 3d DCA 1987)).

[79] *Teleglobe USA, Inc. v. BCE, Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 365 (3d Cir. 2007).

[80] *Id.* (citing Restatement (Third) of the Law Governing Lawyers § 76 cmt. e.)).

[81] *Id.*

parties to the settlement agreement are all defendants in the *Jackson* proceedings supplementary. And there would be no proceedings supplementary without any underlying liability for wrongful death. For that reason, all of the parties to the settlement agreement would, for instance, have an identical interest in vacating the *Jackson* judgment. They would all likewise have an identical interest in appealing the *Nunziata* and *Webb* judgments. Of course, THMI shares an identical interest in avoiding liability for wrongful death.

As a consequence, the common interest doctrine protects communications between parties to the settlement agreement from being disclosed to third parties, but it cannot be used to protect those communications from disclosure to THMI to the extent the relate to the defense of the wrongful death cases. While the general rule is that parties that share information under the common interest doctrine cannot invoke the attorney-client privilege in subsequent adverse litigation between them, if there are multiple members that share information, and only two become adverse, the party seeking communications is entitled to all communications between members with common interests—not just communications with the adverse party.[82]

The Court cannot conceive of any basis for an attorney for THMI to refuse to share communications he or she received from other parties with identical interests in the wrongful death cases. The Receiver, however, suggests one: he says that the communications between the parties to the settlement agreement are, for the most part, subsumed under a joint defense agreement. But the Court concludes that the joint defense agreement cannot be used to deny the Trustee access to communications relating to the defense of the wrongful death cases for several reasons.

---

[82] *Ohio-Sealy Mattress Mfg. v. Kaplan*, 90 F.R.D. 21, 29 (N.D. Ill. 1980).

For starters, the Receiver does not appear to have ever disclosed a copy of the joint defense agreement. The Court cannot very well refuse the Trustee access to communications she would otherwise be entitled to based solely on an agreement that the Court has never seen. Moreover, according to the Receiver's brief, THMI is a party to the joint defense agreement. The Receiver's own brief says the agreement was signed by Fowler White, the Rydberg firm, Wilkins Tipton, and Wisler Pearlstine—all counsel for THI and THMI—and that those firms signed the agreement "for themselves and their clients."[83] Finally, and most importantly, the joint defense agreement is unenforceable here.

Two years ago, the bankruptcy court for the Southern District of Florida considered the enforceability of joint defense agreements in bankruptcy in *In re Ginn-LA St. Lucie, Ltd.*[84] There, like here, the parties had entered into an agreement that purportedly contracted around the general rule prohibiting co-clients or parties with common interests from invoking the attorney-client privilege in subsequent adverse litigation between them.[85] The joint defense agreement, which was signed six months before the petition date, expressly stated that it was entered into in contemplation of bankruptcy.[86]

The *Ginn-LA St. Lucie* court initially noted that the Restatement (Third) of the Law Governing Lawyers was the only authority permitting parties to circumvent the well-established co-client exception. According to the Restatement, co-client communications are not privileged in subsequent adverse litigation between the parties "[u]nless the co-clients have agreed

---

[83] Doc. No. 614 at 5 n.1.

[84] *In re Ginn-LA, St. Lucie, Ltd.*, 439 B.R. 801, 804-05 (Bankr. S.D. Fla. 2010).

[85] *Id.* at 803.

[86] *Id.*

otherwise." [87] The Reporter's Note, however, observed that there was no direct authority for that proposition. So the *Ginn-LA St. Lucie* court looked to the only case that had previously considered the issue—*In re Mirant*.[88]

In *Mirant*, the same law firm represented the debtor and its former parent in connection with a transaction in which the parent divested itself of its interest in the debtor. The parties had signed a "protocol for legal representation" prohibiting the parties from sharing confidential information even if they later became adverse to each other.[89] About two years after the transaction was closed, the debtor filed for chapter 11 bankruptcy and sought documents relating to the transaction as part of its investigation into potential claims against the former parent.

While acknowledging that the attorney-client privilege "was meant to foster open communications between the attorney and client," the *Mirant* court recognized that the privilege must give way when necessary to promote an important public policy. According to the *Mirant* court, allowing the parent company to invoke the attorney-client privilege to deny the debtor access to documents related to the corporate transaction would thwart the goals of bankruptcy law.[90] After all, the debtor was acting as a fiduciary for the benefit of its creditors, so it was important for both the creditors and the public that the parent company's liability be thoroughly explored.[91]

---

[87] *Id.* at 805 (quoting Restatement (Third) Governing Lawyers § 75).

[88] *Id.* at 806 (citing *In re Mirant*, 326 B.R. 646 (Bankr. N.D. Tex. 2005)).

[89] *In re Mirant*, 326 B.R. at 648.

[90] *Id.* at 654 (explaining that "[i]n a bankruptcy case, the need for investigation is far more acute than is any concern for attorney-client communications").

[91] *Id.* at 654-55.

Applying the rationale from *Mirant*, the *Ginn-LA St. Lucie* court likewise concluded that enforcing the joint defense agreement would offend public policy.[92] According to the court, enforcement of the joint defense agreement in that case would thwart the trustee's statutory duties:

> While the [joint defense agreement] might indeed further the presumed intent of the parties, its enforcement in this matter risks frustrating the Trustee's statutory duty to investigate the financial affairs of the Debtors while providing special protection to those who allegedly controlled the Debtors prior to the Petition Date. The ability of such provisions to shield wrongdoers at the expense of a debtor's creditors renders their enforcement in bankruptcy proceedings against public policy.[93]

The same policy considerations that exist in *Mirant* and *Ginn-LA St. Lucie* exist in this case. The Trustee has a statutory duty to investigate potential claims against THI and the law firms that represented THI and THMI in the wrongful death cases. It is, of course, important to the creditors that those potential claims be thoroughly investigated. And it is just as important— if not more so—that the Trustee be able to direct the defense of THMI. The ability of the Trustee to fulfill those statutory duties is of paramount importance to the integrity of the bankruptcy system. Yet, the potential targets of the breach of fiduciary duty and malpractice claims seek to invoke the joint defense privilege (as memorialized in their joint defense agreement) to deny the Trustee access to (i) the only information available to investigate potential claims against them; and (ii) information that is critically necessary to direct THMI's defense in the wrongful death cases. Because enforcing the joint defense agreement would be contrary to the goals of bankruptcy, the Court concludes that the Receiver cannot rely on the joint defense agreement to deny the Trustee access to communications related to the defense of the wrongful death actions.

---

[92] *In re Ginn-LA St. Lucie, Ltd.*, 439 B.R. at 805-07.

[93] *Id.* at 805-06.

<u>The lawyers cannot assert the work product doctrine</u>

The co-client exception and common interest doctrine analysis governing the attorney-client privilege applies with equal force to the work product doctrine. Under the Court's attorney-client privilege analysis, the Trustee would ordinarily be entitled to the litigation files containing the work product of the lawyers representing THI and THMI. But the Receiver, as well as Christine Zack and Kristi Anderson (both in-house counsel for Fundamental Administrative Services) raise another issue: they claim the individual attorneys—and not THMI—can invoke that work product doctrine to avoid turning over their litigation files to the Trustee (standing in the shoes of their former client).[94]

As a preliminary matter, there seems to be some dispute about whether state or federal law applies. The Receiver, on the one hand, contends that state law governs application of the work product doctrine in this case.[95] The Trustee, on the other hand, says federal law governs.[96] And Ms. Zack and Ms. Anderson both argue under federal law.[97] The Court, however, need not decide whether state or federal law governs application of the work product doctrine because the answer is the same in either case.

The sole authority for the Receiver's claim that the work product doctrine belongs to the attorney under state law is *Donahue v. Vaughn*.[98] The Receiver cites that case for the proposition that "there is no duty upon a private attorney to give any of his files to a client, save documents

---

[94] Doc. Nos. 612; Doc. No. 625 at 4; Doc. No. 620.

[95] Doc. No. 620 at 2-3.

[96] Doc. No. 623 at 3-4.

[97] Doc. No. 625 at 4-7; Doc. No. 612.

[98] Doc. No. 620 (citing *Donahue v. Vaughn*, 721 So. 2d 356, 57 (Fla. 5th DCA 1998)).

which are solely those of the client and held by the lawyer."[99] While the *Vaughn* court, indeed, says that a private attorney has no obligation to give any of his or her files to a client, the court there was not addressing whether the attorney or client holds the work product privilege.[100] Rather, it was addressing whether an attorney has to give his client a copy of his file for free. That case does not say anywhere that an attorney can invoke the work product doctrine to avoid turning over his or her files if the client is willing to pay for the copies.[101] So Florida law does not permit an attorney to refuse to turn over files to a client willing to pay for them.

Ms. Zack, however, says there are some federal court decisions to that effect. Ms. Zack, for instance, cites *United Steelworkers of America v. Ivaco* for the proposition that the "work-product doctrine belongs to both the client and attorney" and that "a waiver of the privilege by the client does not deprive the attorney of his own privilege."[102] She likewise cites *QBE Insurance Corp. v. Griffin* for the proposition that "the work-product privilege is shared between the attorney and the client" and that "an attorney may contest disclosure [of work product] even in the face of the client's waiver."[103] But neither of those decisions involves an attorney invoking the work product doctrine to refuse turning over his or her files to a client.[104]

And in any case, there is a more fundamental problem for the Receiver, Ms. Zack, and Ms. Anderson: the Trustee has stepped into the shoes of THMI, and numerous bankruptcy cases

---

[99] *Id.*

[100] *Donahue*, 721 So. 2d at 356-57.

[101] *Id.; see also In re Ginn-LA St. Lucie, Ltd.*, 439 B.R. 801, 809 (Bankr. S.D. Fla. 2010) (explaining that *Donahue* "addressed whether counsel was required to provide documents to a client free of charge").

[102] Doc. No. 625 at 4 (citing *United Steelworkers of Am., AFL-CIO-CLC v. Ivaco, Inc.*, 2002 WL 31932875, at *6 (N.D. Ga. Jan. 13, 2003)).

[103] *Id.* (citing *QBE Ins. Co. v. Griffin*, 2009 WL 2913478, at *3 (M.D. Ala. Sep. 4, 2009)).

[104] *Ivaco*, 2002 WL 31932875, at *6; *Griffin*, 2009 WL 2913478, at *3.

have concluded that an attorney cannot withhold documents against their former clients based on the work product privilege.[105] For instance, in *Ginn-LA St. Lucie*, Judge Hyman stated that "the majority view [is] that upon termination of the attorney-client relationship, where no claim for unpaid legal fees is outstanding, the client is presumptively accorded full access to the entire attorney's file."[106]

Even more instructive is the court's analysis in *In re Equaphor*.[107] In that case, Whiteford, Taylor & Preston, which acted as the debtor's corporate counsel, represented the debtor and three of its officers who had been named as defendants in a shareholder derivative suit. The debtor had only been named as a nominal defendant in that suit. Four months after the shareholder derivative suit was brought, the debtor filed for chapter 7 bankruptcy, and the law firm representing it (and the individual officers) in the shareholder derivative suit withdrew. The chapter 7 trustee later sought turnover of the litigation files from the law firm representing the debtor in the shareholder derivative suit.

Of course, the law firm representing the debtor and individual officers objected based on the work product privilege. The law firm contended that its notes and internal memoranda were work product and not part of the client files that the Trustee was entitled to. The court agreed that

---

[105] *See, e.g., In re Ginn-LA St. Lucie, Ltd.*, 439 B.R. 801, 809 (Bankr. S.D. Fla. 2010); *In re Equaphor, Inc.*, 2012 WL 1682583, at *5 (Bankr. E.D. Va. May 14, 2012); *see also Spivey v. Zant*, 683 F.2d 881, 885 (5th Cir. 1982) (holding that "the work product doctrine does not apply to the situation in which a client seeks access to documents or other tangible things created or amassed by his attorney during the course of the representation"); *Clark v. Milan*, 847 F. Supp. 424, 426 (S.D. W. Va. 1994) (explaining that courts have concluded that the work product doctrine does not apply when a client seeks document created for him by his own lawyer); *Ashcraft & Gerel v. Shaw*, 728 A.2d 798, 814-15 (Md. Ct. App. 1999) (explaining that "the focus of the work product doctrine is non-disclosure to one's *adversary*") (emphasis in original).

[106] *In re Ginn-LA St. Lucie, Ltd.*, 439 B.R. at 809.

[107] *In re Equaphor, Inc.*, 2012 WL 1682583, at *5.

attorney opinion work product (such as the attorney's mental impressions and theories) "enjoys

nearly absolute protection from disclosure under the rules of discovery."[108]

Nevertheless, the court ordered the law firm to turn over the files because courts are

uniform in holding that an attorney cannot use the work product privilege to deny a client access

to its files:

> [T]his is not a discovery dispute in the ordinary sense of the term.
> It is a motion to compel the turnover of the law firm's files under
> 11 U.S.C. § 542(e) to the party who now stands in the shoes of the
> former client, the Debtor. Under these circumstances, the courts
> have been uniform in holding that the work product doctrine does
> not prevent the turnover of the files. [The law firm] will be ordered
> to turn over its entire files, notwithstanding any claim or assertion
> of work product.[109]

According to Ms. Zack, *Equaphor* (and the cases cited in it) are distinguishable because the court

in that case was not ordering turnover of a law firm's files to an adverse party.[110]

Ms. Zack's argument, however, confuses the issue. To be sure, the Trustee is currently

adverse to Ms. Zack in two cases pending in federal district court (a malpractice action and an

action for the unlicensed practice of law). And there are cases for the proposition that the "work

---

[108] *Id.*

[109] *Id.* (citing *Foster v. Hill (In re Foster),* 188 F.3d 1259, 1272 (10th Cir. 1999) (rejecting work product claim in connection with turnover of attorney's files); *Loeffler v. Lanser (In re ANR Advance Transp. Co.),* 302 B.R. 607, 617 (E.D. Wis. 2003) (explaining that to "grant the law firms work product immunity under the circumstances present here would not serve the purpose of the work product doctrine" and that "[c]lients are not adversaries of their lawyers, and the zone of privacy that the work product rule protects was designed to shield lawyers from their opponents, not their clients"); *Gardner, Willis, Sweat & Handelman, LLP v. Kelly (In re Golden Grove Pecan Farm),* 460 B.R. 349, 352–53 (Bankr. M.D. Ga. 2011); *Teleglobe Commc'ns Corp. v. BCE, Inc. (In re Teleglobe Commc'ns Corp.),* 2006 WL 2568371, at * 16 (D. Del. Feb. 22, 2006) (explaining that "[b]ecause work product is created for the benefit of the client, the interest in protecting documents from an adversary is not present in this case"); *In re Am. Metrocomm Corp.,* 274 B.R. 641, 654–55 (Bankr. D. Del. 2002)) (internal citations omitted); *see also* Edna Selan Epstein, *The Attorney–Client Privilege & Work Product Doctrine* 607 (4th ed. 2001) ("Based on *Weintraub,* it would seem to follow without question that a trustee-in-bankruptcy for a corporate entity has a right to the work product of the debtor's attorney").

[110] Doc. No. 625 at 5.

product rule is designed to protect the lawyers' work from his litigation adversary."[111] But that refers to one party seeking to obtain his adversary's work product generated in the same case. Here, the Trustee is seeking work product generated during the wrongful death cases. THMI and Ms. Zack were not adverse during the wrongful death cases. The Trustee is not seeking to obtain work product Ms. Zack or her attorneys have generated in the pending federal court cases.

And that is what the work product doctrine seeks to protect against—not disclosure of work product generated in a previous case:

> The purpose of shielding attorney work product from disclosure is to protect "the adversarial process by providing an environment of privacy in which a litigator may creatively develop strategies, legal theories, and mental impressions outside the ordinary realm of federal discovery provisions, thereby insuring that the litigator's opponent is unable to ride on the litigator's wits.[112]

Since that interest is not implicated here, neither the law firms nor Fundamental Administrative Services' in-house counsel (Ms. Zack and Ms. Anderson) have the right to invoke the work product doctrine to deny the Trustee access to the litigation files for the wrongful death cases.

Besides, the work product doctrine does not apply for another reason. THI and the Receiver retained counsel for THMI under an indemnification agreement. Under that indemnification agreement, THI is obligated to provide THMI access to the books and records relating to the wrongful death litigation files and cooperate with THMI. As the court in *Abbott Laboratories v. Alpha Therapeutic Corp.* recognized, those cooperation clauses are designed to assist parties in determining their respective rights.[113] Now that the Trustee (standing in THMI's shoes) needs the litigation files to direct THMI's defense of the wrongful death cases and

---

[111] *Id.* (citing *In re ANR Advance Transp. Co.*, 302 B.R. 607, 617 (Bankr. E.D. Wis. 2003)).

[112] *Abbot Labs. v. Alpha Therapeutic Corp.*, 200 F.R.D. 401, 408 (N.D. Ill. 2001) (quoting *Certain Underwriters at Lloyds v. The Fid. & Cas. Co. of New York*, 1997 WL 769467, at *3 (N.D. Ill. Dec. 9, 1997)).

[113] *Id.* at 409.

evaluate potential claims on behalf of the estate, it would be unfair to allow THI (or its attorneys) to invoke the work product doctrine.

The Trustee cannot disclose the attorney-<br>client communications or work product

One consistent theme throughout this bankruptcy case has been the Receiver's claim—and the claim by others—that the Trustee is in cahoots with the creditors (the plaintiffs in the wrongful death cases). The theory goes that the Trustee wants THI and THMI to be liable for hundreds of millions—if not billions—of dollars in judgments because without any judgments against THI and THMI there are no claims against the Debtor, and without claims against the Debtor, there is no bankruptcy case. And without this case, the Trustee cannot collect a potentially enormous statutory fee. The Receiver fears that the Trustee will potentially sabotage THI's defense by sharing the attorney-client communications and work product with the wrongful death plaintiffs.

The Trustee, however, is prohibited from disclosing the attorney-client communications or work product to any party that would result in the privileges being destroyed. That is because the Trustee is obtaining the communications under the co-client exception and common interest doctrine, and waiver of the privilege under those circumstances requires consent of all of the parties who share the privilege.[114] Courts that have granted parties access to attorney-client communications or work product under the co-client exception or common interest doctrine have seen fit to prohibit those parties from disclosing the communications or work product to third parties.[115] This Court will do the same here.

---

[114] *Durkin v. Shields (In re Imperial Corp. of Am.)*, 179 F.R.D. 286, 289 (S.D. Cal. 1998); *Ohio-Sealy Mattress Mfg. v. Kaplan*, 90 F.R.D. 21, 29 (N.D. Ill. 1980).

[115] *Ohio-Sealy Mattress*, 90 F.R.D. at 32-33.

**Conclusion**

According to an ancient Greek legend, King Gordius tied his ox-cart to a post using an intricate knot. An oracle prophesied that whoever untied the knot would be the future king of Asia. Over time, many individuals tried and failed to untie the knot. In 333 B.C., Alexander the Great eventually happened upon the knot and, after unsuccessfully attempting to untie it, sliced it in half with his sword. Today, the phrase "Gordian knot"—derived from that ancient Greek legend—refers to an "exceedingly complicated problem."[116]

At first glance, the privilege issues in this case appear to be a classic Gordian knot. On the one hand, the Trustee needs communications between THI and counsel defending THI and THMI in the wrongful death cases (as well as the law firms' litigation files) so that her new lawyers can prosecute appeals in *Nunziata* and *Webb* and direct THMI's defenses in the remaining cases. On the other hand, THI and the Receiver say—and the Court does not doubt— that they subjectively believed their communications to the law firms would be private because THMI was defunct. And in-house counsel for Fundamental Administrative Services fear their work product will be used against them in pending malpractice and unlicensed practice of law claims. But unlike the bold action required by Alexander the Great, the Court here simply resorts to public policy to solve the problem.

Although the attorney-client privilege fosters an important public interest of full and frank disclosure between attorneys and their clients, it is not absolute.[117] Here, as is often the case, invocation of the privilege would impede the search for truth. And because the need to investigate the truth is far more acute in bankruptcy than is any concern for attorney-client

---

[116] http://www.thefreedictionary.com/Gordian+knot.

[117] *Burden v. Church of Scientology of California*, 526 F. Supp. 44, 45 (M.D. Fla. 1981).

communications, the privilege must give way. The court in *Burden v. Church of Scientology of California* recognized just that in a slightly different context (involving the identity of a client):

> As between the social policies competing for supremacy, the choice is clear. Disclosure should be made if we are to maintain confidence in the bar and in the administration of justice.[118]

Here, allowing THI and the Receiver to invoke the attorney-client privilege with respect to communications relating to the defense of the wrongful death cases would thwart the Trustee's statutory duties. Allowing Ms. Zack and Ms. Anderson (or the other firms representing THI and THMI) to invoke the work product privilege to avoid turning over the litigation files for those cases would do the same.

Accordingly, for the reasons set forth above, the Court concludes that the Trustee is entitled to invoke the co-client exception to obtain (i) any communications between THI (and the Receiver) and the law firms representing THI and THMI in the wrongful death cases; (ii) any communications between Fundamental Administrative Services (including Ms. Zack and Ms. Anderson) and the law firms representing THI and THMI (but not communications solely between Fundamental Administrative Services and the Receiver); (iii) communications between the parties to the settlement agreement (and their lawyers) *with respect to the defense of the wrongful death cases*; and (iv) copies of the litigation files (including any attorney work product) for the wrongful death cases.

The Trustee, however, is not entitled to any communication or litigation files relating to defense of the proceedings supplementary, opposition to the Trustee's efforts to obtain the litigation files, the Trustee's efforts to control the defense of THMI, or other issues unrelated to the defense of the wrongful death cases. Nor is the Trustee (or her attorneys) permitted to share

---

[118] *Id.*

any of the information they obtain under the co-client exception with any third party that would

destroy the attorney-client and common interest privilege, common interest doctrine, and work

product doctrine (such as the plaintiffs in the wrongful death cases or their attorneys).

      **DATED** in Chambers at Tampa, Florida, on _____March 19, 2013_____.

_____

Michael G. Williamson
United States Bankruptcy Judge

Copies to be provided by CM/ECF service.

**Steven M. Berman, Esq.**
**Shumaker Loop & Kendrick, LLP**
*Counsel for Trustee*

**Patricia A. Redmond, Esq.**
**Stearns Weaver Miller Weissler**
**Alhadeff & Sitterson, P.A.**
*Counsel for Receiver*

**Gregory M. McCoskey, Esq.**
**Akerman Senterfitt**
*Counsel for Fundamental Administrative Services, LLC*

**Marsha G. Rydberg, Esq.**
**The Rydberg Law Firm, P.A.**

**Rick L. Brunner, Esq.**
**Brunner Quinn**
*Counsel for Christine Zack*

**Steven N. Leitess, Esq.**
**Leitess Friedberg PC**
*Counsel for Kristi Anderson*

**Harley E. Riedel, Esq.**
**Stichter Riedel Blain & Prosser, P.A.**
*Counsel for the Estate of Juanita Jackson*