ORDERED.

**Dated:  August 21, 2019**

Michael G. Williamson
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                     Case No. 8:11-bk-22258-MGW
                                                          Chapter 7
Fundamental Long Term Care, Inc.
and Trans Health Management, Inc.,

        Debtors.
_____/

**MEMORANDUM OPINION AND
ORDER ON MOTION TO DISQUALIFY
STEVEN M. BERMAN, ESQUIRE AND
SHUMAKER, LOOP & KENDRICK, LLP AS COUNSEL
TO THE CHAPTER 7 TRUSTEE NUNC PRO TUNC
AND FOR DISGORGEMENT OF COMPENSATION**

THIS CASE came before the Court without a hearing to consider the

Probate Estates' Motion to Disqualify Steven M. Berman, Esquire and

Shumaker, Loop & Kendrick, LLP as Counsel to the Chapter 7 Trustee

*Nunc Pro Tunc* and for Disgorgement of Compensation (the Disgorgement

Motion).[1]  Shumaker, Loop & Kendrick, LLP and Steven M. Berman (together, Shumaker) filed a Memorandum and Statement of Facts in Opposition to the Disgorgement Motion.[2]

This bankruptcy case originated from six wrongful death actions filed by the Probate Estates against nursing homes in which residents had died. In the bankruptcy case, the Probate Estates and the Chapter 7 Trustee sought to collect judgments that had been entered in favor of the Probate Estates in the wrongful death actions.  The Probate Estates are the only creditors in the bankruptcy case.

Shumaker was employed in the bankruptcy case as special litigation counsel to the Chapter 7 Trustee.  In the Disgorgement Motion, the Probate Estates primarily contend that Shumaker also represents Healthcare REIT, Inc. n/k/a Welltower Inc. (Healthcare REIT), which leased the underlying real property to certain of the nursing homes involved in the wrongful death actions.  According to the Probate Estates, Healthcare REIT's interest is adverse to the Probate Estates and to the bankruptcy estate, and Shumaker's representation of Healthcare REIT was not timely disclosed to creditors or the Court.

Under § 327 of the Bankruptcy Code, a trustee may employ professionals who do not hold or represent any interest adverse to the

---

[1] Doc. 2153.
[2] Docs. 2171, 2172.

estate and who are disinterested.  Under Rule 2014 of the Bankruptcy
Rules, applications to employ the professionals must set forth the
professional's connections to the debtor, creditors, and other parties in
interest.

Healthcare REIT owned the real property on which certain nursing
homes were located, but had no involvement in the operation of the
facilities.  Additionally, despite exhaustive investigation, neither the
Probate Estates nor the Chapter 7 Trustee ever considered Healthcare
REIT as potentially liable to the bankruptcy estate because of any
prepetition transactions.   Accordingly, Shumaker's representation of
Healthcare REIT was not adverse to the Probate Estates or the bankruptcy
estate, and Shumaker's omission of the representation from its initial
disclosures did not violate Rule 2014.  The Disgorgement Motion should be
denied.

## I. Background

Before March 2006, Trans Health Care, Inc. (THI) owned a number of
subsidiaries that operated nursing homes throughout the United States.
Trans Health Management, Inc. (THMI) provided administrative support
for the nursing homes.[3]

---

[3] The events preceding the filing of the bankruptcy case are described in *In re
Fundamental Long Term Care, Inc.*, 527 B.R. 497, 502-03 (Bankr. M.D. Fla. 2015).

In 2004, the Estate of Juanita Jackson filed an action against THI and THMI for negligence or wrongful death.  Between 2005 and 2009, the Estates of Elvira Nunziata, James Jones, Joseph Webb, Opal Sasser, and Arlene Townsend filed five additional wrongful death actions against THI and THMI.

In 2010, the attorneys representing THI and THMI withdrew, and the Estate of Juanita Jackson ultimately obtained an empty-chair judgment against THI and THMI in the amount of $110 million.[4]  In an effort to collect on the judgment, the Estate of Juanita Jackson then pursued proceedings supplementary against the Debtor and other new defendants in state court.  THMI was a wholly owned subsidiary of the Debtor.  In September 2011, the Estate of Juanita Jackson obtained an amended judgment adding the Debtor to the original $110 million judgment.

On December 5, 2011, the Estate of Juanita Jackson filed an involuntary Chapter 7 petition against the Debtor, and an order for relief was entered in the bankruptcy case on January 12, 2012.  Beth Ann Scharrer (the Trustee) was appointed as the Trustee of the Chapter 7 estate.

To administer the estate, the Trustee began investigating and pursuing potential fraudulent transfer, alter ego, and other related claims arising out of an alleged prepetition "bust-out" scheme.  According to the

---

[4] *In re Fundamental Long Term Care, Inc.*, 507 B.R. 359, 371 (Bankr. M.D. Fla. 2014).

Trustee, THI's corporate parent and its primary shareholder had first conspired to allow THI's two primary secured lenders to loot THI and THMI in order to repay approximately $75 million in loans. Then, THMI's assets had been transferred to a number of entities and individuals known as the "Fundamental Entities" for far less than their fair market value. Finally, to complete the alleged bust-out scheme, THMI's remaining shell had been transferred to the Debtor, which was created for the sole purpose of acquiring THMI's liabilities, and THI was permitted to go out of business before being put into a state court receivership.[5]

While the Trustee's investigations were pending, the Probate Estates had been pursuing virtually identical claims in state court.[6] Accordingly, the Court determined that the related proceedings should be litigated in one forum with all of the parties as participants, and that the forum should be the bankruptcy court because it has jurisdiction over property of the estate wherever located. "So the Court required a single proceeding – involving the Trustee, the creditors, and the targets – for resolving any fraudulent transfer, alter ego, and other related claims."[7]

The Probate Estates filed an initial complaint, the Trustee intervened, and the Probate Estates and the Trustee later obtained leave to file all of their claims together in one joint complaint. The initial joint

---

[5] *In re Fundamental Long Term Care, Inc.*, 527 B.R. at 504.
[6] *Id.* at 505.
[7] *Id.* at 506.

complaint contained 22 counts against seventeen defendants, which can be grouped into eight different claims for relief: (1) one count for substantive consolidation by the Trustee, (2) two counts for breach of fiduciary duty, (3) four counts for aiding and abetting a breach of fiduciary duty, (4) one count for successor liability, (5) two counts for piercing the corporate veil, (6) three counts for alter-ego liability, (7) eight counts for fraudulent transfer, and (8) one count for conspiracy to commit fraudulent transfer. The Probate Estates and the Trustee later further amended the complaint to assert new claims for abuse of process, conspiracy to commit abuse of process, negligence, and avoidance of a post-petition transfer.[8]

The proceeding was tried over a two-week period in 2014. Following the trial and review of extensive evidence, the Court announced its tentative findings and conclusions and ordered a mediation. The mediation was successful and resulted in two compromises totaling nearly $20 million.[9]

In addition to the main proceeding, the Trustee brought a separate adversary proceeding against Trans Healthcare, Inc., through its Receiver, for breach of contract and related claims.[10] The claims were settled for the sum of $700,000.00.[11]

---

[8] *Id.* at 506-07.
[9] *Id.* at 507.
[10] Adv. Pro. 8:13-ap-1007-MGW.
[11] Doc. 1857.

Finally, the Trustee also brought separate adversary proceedings against Quintairos, Prieto, Wood & Boyer, P.A. and five other defendants,[12] and against Troutman Sanders LLP and two other defendants[13] for professional negligence and related claims in connection with the alleged "bust-out" scheme.  The proceeding against Quintairos was ultimately settled for $1.25 million,[14] and the proceeding against Troutman was settled for $6.5 million.[15]

**II. Shumaker**

Early in the bankruptcy case, on June 1, 2012, the Trustee filed an Application to Employ Special Counsel Pursuant to 11 U.S.C. § 327(a).[16]  In the Application, the Trustee asked for authority to employ Shumaker as special counsel "to assist in litigation" in the case.  The Application was approved without objection on June 5, 2012.[17]  Shumaker's employment continued for three and one-half years until December 2015, when Shumaker filed a Motion to Withdraw as Special Litigation Counsel.  Shumaker stated in the Motion to Withdraw that:

> 3. On October 28, 2015, this Court entered its Order Approving Compromise Among the Trustee, Estate Professionals, and Probate Estates Regarding Payment of Administrative Expenses (Doc. 1855)("Compromise Order").  Among other terms of the settlement approved by the

---

[12] Adv. Pro. 8:13-ap-1176-MGW.
[13] Adv. Pro. 8:14-ap-486-MGW.
[14] Doc. 1854.
[15] Doc. 2127.
[16] Doc. 158.
[17] Doc. 165.

7

Compromise Order, the settlement contemplates that [Shumaker's] involvement in litigation on behalf of the Trustee and the bankruptcy estate is concluded.

The compromise described in the Motion included a provision for payment to Shumaker of fees in the amount of $5,000,000.00, and costs in the amount of $620,148.48, for a total payment of $5,620,148.48.[18]  On December 22, 2015, the Court entered an Order Granting Shumaker's Motion to Withdraw as Litigation Counsel.[19]

### III. Section 327 and Rule 2014

Section 327(a) provides that a trustee, with the court's approval, may employ one or more attorneys or other professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title."[20]  A "disinterested person" is defined in the Bankruptcy Code as a person who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason."[21]

The Eleventh Circuit Court of Appeals has held that a professional has an interest adverse to the estate when he:

---

[18] Ex. 1 to Doc. 1802.
[19] Doc. 1901.
[20] 11 U.S.C. § 327(a).
[21] 11 U.S.C. § 101(14)(C).

possess[es], or serv[es] as an attorney for a person possessing, either an economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant . . . or . . . a predisposition under the circumstances that render such a bias against the estate.[22]

In evaluating the circumstances surrounding a claim of adverse interest, the issue is whether the professional was able to make unbiased or impartial decisions in the best interest of the estate, regardless whether the decisions actually resulted in fraud or unfairness.[23]

Rule 2014 of the Federal Rules of Bankruptcy Procedure implements the disinterestedness provisions of § 327(a) by requiring professional persons to make certain disclosures at the time that they seek approval of their employment.  Specifically, a professional must set forth "the person's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee."[24]  Under the rule, a professional must disclose all "connections" to parties in interest "that are not so remote as to be *de minimis*."[25]

---

[22] *In re New River Dry Dock, Inc.*, 497 Fed. Appx. 882, 886-87 (11th Cir. 2012)(quoting *Electro-Wire Products, Inc. v. Sirote & Permutt, P.C. (In re Prince)*, 40 F.3d 356, 361 (11th Cir. 1994)(quoting *Roger J. Au & Son, Inc. v. Aetna Ins. Co.*, 64 B.R. 600, 604 (N.D. Ohio 1986)).

[23] *In re New River Dry Dock, Inc.*, 497 Fed. Appx. at 887.

[24] Fed. R. Bankr. P. 2014(a).

[25] *In re Fullenkamp*, 477 B.R. 826, 834 (Bankr. M.D. Fla. 2011)(quoting *In re Leslie Fay Cos., Inc.*, 175 B.R. 525, 536 (Bankr. S.D. Fla. 1994)).

A professional who violates § 327(a) and Rule 2014 may be disqualified and may be required to disgorge any fees that they have received for the representation.  Section 328(c) of the Bankruptcy Code, for example, provides that the Court may deny compensation to a professional person employed under § 327 if, at any time during the professional person's employment, he "is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed."[26]  Similarly, a failure to disclose the connections required by Rule 2014 "can warrant disqualification, denial of compensation, and disgorgement of any compensation already received."[27]

### IV. The Disgorgement Motion

The Probate Estates filed the Disgorgement Motion on June 4, 2018, two and one-half years after Shumaker's withdrawal from its employment as the Trustee's special litigation counsel.

The Disgorgement Motion was also filed after the Probate Estates unsuccessfully objected to the Trustee's compromise of the proceeding against Troutman Sanders LLP.[28]  In the Objection, the Probate Estates complained that the Trustee's compromise improperly barred them from

---

[26] 11 U.S.C. § 328(c).
[27] *In re Hutch Holdings, Inc.*, 532 B.R. 866, 881 (Bankr. S.D. Ga. 2015)(quoting *In re Adam Furniture Indus., Inc.*, 158 B.R. 291, 299 (Bankr. S.D. Ga. 1993)).
[28] Docs. 2006, 2127.

pursuing their own claims against Troutman, and that the compromise did not fairly disclose the amount of any distribution that the Probate Estates would receive from the settlement funds.[29]

The Probate Estates have already received approximately $16.2 million out of $23.7 million in settlements generated by the Trustee during the course of the bankruptcy case.  Of the $16.2 million paid to the Probate Estates in the aggregate, however, each individual probate estate actually received $1 million less a $50,000.00 "future cost reserve."  The balance of the distribution paid to the Probate Estates from the bankruptcy estate was disbursed to their attorneys for their fees and other charges.  Consequently, the six Probate Estates received less than $6 million from their total distribution of $16.2 million, and the remaining $10 million was used to pay the Probate Estates' attorney's fees and costs.[30]

But the fees and costs charged by the Probate Estates' attorneys exceed $10 million by more than $7 million.  Accordingly, the attorneys reached an agreement with the representatives of the Probate Estates to defer "the remaining [$7,352,104.38] balances of the attorney's fees for collection from any future settlements."[31]

---

[29] Doc. 2006.

[30] Doc. 2217; *Estate of Juanita Jackson, et al. v. Beth Ann Scharrer*, No. 8:17-cv-1545-T-23, pp. 3-4 (M.D. Fla. filed May 30, 2019).

[31] *Estate of Juanita Jackson, et al. v. Beth Ann Scharrer*, No. 8:17-cv-1545-T-23, at p. 4.

11

The attorneys were dissatisfied with the Trustee's settlement of the proceeding against Troutman, therefore, because the projected $2.8 million distribution to the Probate Estates from the settlement was insufficient to pay their deferred attorney's fees in the amount of $7,352,104.38.[32] Nevertheless, the Trustee's compromise of the proceeding against Troutman was approved on May 17, 2017.[33]

While the Order approving the Trustee's compromise with Troutman was on appeal, the Probate Estates filed the Motion seeking Shumaker's disgorgement of all past and future compensation approved by the Court.[34]

In their Summary of Argument in the Disgorgement Motion, the Probate Estates assert that they have uncovered connections between Shumaker and at least four entities that affected Shumaker's disinterestedness:  (1) Healthcare REIT, which they assert is "an actual or potential adversary" of the Probate Estates and the bankruptcy estate; (2) two entities known as Lyric Health Care, LLC and Lyric Health Care Holdings III, Inc. (together, Lyric), which they assert are adversaries of the Probate Estates and THMI, the Debtor's subsidiary; and (3) Home Quality

---

[32] *Id*. at 10.

[33] Doc. 2127.

[34] Doc. 2153.  *See also* Shumaker's Statement of Facts for Memorandum in Opposition to Disgorgement Motion, Doc. 2172, pp. 11-13("That Wilkes is now demanding disgorgement of all funds paid to Shumaker for work in the bankruptcy case, which would cover the remaining portion of his purported "Deferred Fees" after distribution of the Troutman Settlement proceeds, is not a coincidence.").

Management, Inc. (HQM), which they assert is an adversary of two of the Probate Estates.[35]

According to the Probate Estates, Shumaker was unable to fulfill its fiduciary duties to the only creditors in the bankruptcy case (the Probate Estates) because of its connections to Healthcare REIT, Lyric, and HQM.[36] Consequently, the Probate Estates contend that Shumaker must be disqualified retroactively to the date of its employment, and that it must be ordered to disgorge all compensation received in the case.[37]

### V. Healthcare REIT

In the introduction to the Disgorgement Motion, the Probate Estates assert that Shumaker did not disclose for six years that Healthcare REIT was a long-term active client of the firm, and that Healthcare REIT "was the owner of the nursing homes where the majority of the creditor body resided."[38]

### A. Shumaker represents Healthcare REIT.

It is undisputed that Shumaker represents Healthcare REIT.  In his sworn Supplemental Disclosure dated May 4, 2018, Steven M. Berman (Berman), a partner at Shumaker, described the firm's attorney-client relationship with Healthcare REIT:

---

[35] Doc. 2153, p. 26.
[36] Doc. 2153, p. 31.
[37] Doc. 2153, pp. 33-35.
[38] Doc. 2153, p. 1.

> Healthcare REIT is a publicly traded company and an active [Shumaker] client. [Shumaker] generally represents Healthcare REIT in corporate, real estate, and other transactional matters, in the nature of outside general counsel. [Shumaker] has represented Healthcare REIT for thirty years.[39]

According to the sworn Supplemental Disclosure, Shumaker has never been aware of any relationship between Healthcare REIT and the Debtor or THMI.[40]

### B. Healthcare REIT is not adverse to the Probate Estates.

Healthcare REIT is a real estate investment trust with its principal place of business in Toledo, Ohio.[41] In the sworn Supplemental Disclosure, Berman stated that the "only tangential connection between Healthcare REIT and any of the Probate Estates, [is that] on or about June 30, 2005, . . . Healthcare REIT purchased the real property located at 919 Old Winter Haven Road, Auburndale, Florida – the location of the Auburndale Oaks facility in which Ms. Townsend and Ms. Jackson resided for a period of time (the 'Auburndale Oaks Property')."[42]

But Healthcare REIT did not operate the Auburndale Oaks nursing home. It leased the Auburndale Oaks Property to a tenant (one of the Lyric entities) that operated the nursing home. In an Affidavit filed in state court in 2010, a Vice President of Healthcare REIT stated:

---

[39] Doc. 2150, ¶ 11.
[40] Doc. 2150, ¶ 12.
[41] Ex. 4 to Doc. 2150.
[42] Doc. 2150, ¶ 14.

> 6. [Healthcare REIT] leased the Real Property to Lyric Health Care Holdings III, Inc. ("Tenant") on June 30, 2005.
>
> 7. [Healthcare REIT] serves only as a Landlord to its Tenant for the Real Property.
>
> 8. [Healthcare REIT] does not control the services provided by its Tenants or its Tenant's agents, employees or representatives.  It does not operate, nor has it ever operated, Auburndale Oaks Healthcare Center, nor does it control, nor has it ever controlled, the services provided by Auburndale Oaks Healthcare Center, its agents, employees or representatives.
>
> 9. [Healthcare REIT] has never had any control over the hiring, supervision, or management of employees at Auburndale Oaks Healthcare Center and it does not administer, direct, supervise, or provide health care or skilled nursing services at any facility, including Auburndale Oaks Healthcare Center.[43]

Even though Healthcare REIT had no involvement in the operation of the nursing home, the Probate Estates contend that it was potentially liable to the residents of Auburndale Oaks because its lease required the tenant/operator to provide Healthcare REIT with certain financial and licensing documents.[44]  But the Probate Estates provide no authority for the proposition that a property owner is liable for a tenant nursing home's negligence.  Further, even if such potential liability did exist, Ms. Townsend's estate is the only party that asserted a claim against Healthcare REIT, and that claim was dismissed with prejudice.[45]

---

[43] Ex. 4 to Doc. 2150.
[44] Doc. 2153, pp. 18-21.
[45] *See* Doc. 2171, pp. 14-15.

Specifically, Healthcare REIT was named as a defendant in the wrongful death action filed by the Townsend Estate in state court in 2009.[46] In the sworn Supplemental Disclosure, Berman states that Shumaker did not represent Healthcare REIT in the action by the Townsend Estate, took only limited action in the case consistent with its role as outside general counsel, did not take any action related to the substantive claims in the case, and did not open a file for the litigation.[47]

In January 2011, Townsend's Estate filed a Notice of Voluntary Dismissal of Healthcare REIT from the action without prejudice.[48]  In August 2011, more than three months before the bankruptcy case was filed, the state court entered an order dismissing the action against Healthcare REIT with prejudice.[49]

In summary, Healthcare REIT owned the real property on which the Auburndale Oaks nursing facility was located, but had no involvement in the operation of the nursing home.  Healthcare REIT was initially named as a defendant in a wrongful death action brought by one of the Probate Estates, but was dismissed from the action with prejudice before the bankruptcy case was filed.  For these reasons, Healthcare REIT is not adverse to the Probate Estates, and Shumaker's representation of

---

[46] The Complaint filed by the Townsend Estate is attached as Ex. 3 to Doc. 2150.
[47] Doc. 2150, pp. 5-7.
[48] Ex. 6 to Doc. 2150.
[49] Ex. 7 to Doc. 2150.

Healthcare REIT did not lessen the value of the bankruptcy estate, create a potential dispute between the bankruptcy estate and Healthcare REIT, or create a circumstance that would generate a bias against the bankruptcy estate.[50]

### C. Healthcare REIT is not adverse to the bankruptcy estate.

Throughout its complex history, the focus of the bankruptcy case has been the pursuit of numerous claims that arose out of the alleged "bust-out" scheme that occurred in March 2006.  Generally, the alleged scheme involved the removal of assets from THI and THMI, which had directly or indirectly owned and operated nursing homes throughout the country, and the transfer of THMI's liabilities to the Debtor.  In the bankruptcy case, the Trustee sought to recover from the scheme's participants based on fraudulent transfer, breach of fiduciary duty, successor liability, alter-ego liability, and a number of other related theories.

In the Disgorgement Motion, the Probate Estates assert that Healthcare REIT had connections to THI and other bankruptcy estate targets that were never investigated or disclosed by Shumaker.  The three specific connections identified by the Probate Estates are (1) the receipt by Healthcare REIT, as landlord, of a $300,000.00 security deposit in the March 2006 transaction; (2) Healthcare REIT's apparently unsuccessful bid to purchase "underlying property" from THI in 2008; and (3) the

---

[50] *In re New River Dry Dock*, 497 Fed. Appx. at 886-87.

preparation of a 2001 "Draft Term Sheet" between Healthcare REIT as Lessor and THI as Lessee for a master lease of nursing homes "in a geographic region to be negotiated."[51]

The record in this case refutes the Probate Estates' suggestion that the bankruptcy estate may have had a claim against Healthcare REIT that was overlooked or not diligently pursued because of Healthcare REIT's attorney-client relationship with Shumaker.  The Trustee and the Probate Estates undertook exhaustive discovery efforts to locate any potential source of recovery for the bankruptcy estate.  The efforts are well-documented.

The main proceeding to resolve the claims stemming from the prepetition transactions, for example, was Adv. Pro. 8:13-ap-893-MGW (the 893 Proceeding).  The Trustee and the Probate Estates filed a joint complaint in the 893 Proceeding that was 228 pages long, contained 1,201 numbered paragraphs, and named seventeen entities or individuals as defendants.[52]  The Trustee and the Probate Estates later amended the complaint to assert additional claims.[53]

---

[51] Doc. 2153, pp. 8-16.
[52] Adv. Pro. 8:13-ap-893-MGW, Doc. 109.  The seventeen defendants are (1) General Electric Capital Corporation; (2) Fundamental Administrative Services, LLC; (3) THI of Baltimore, Inc.; (4) Fundamental Long Term Care Holdings, LLC; (5) Murray Forman; (6) Leonard Grunstein; (7) Rubin Schron; (8) Ventas, Inc.; (9) Ventas Realty, Limited Partnership; (10) GTCR Golder Rauner, LLC; (11) GTCR Fund VI, L.P.; (12) GTCR Partners VI, L.P.; (13) GTCR Executive Fund, L.P.; (14) GTCR Associates VI; (15) Edgar D. Jannotta, Jr.; (16) THI Holdings, LLC; and (17) Fundamental Long Term Care, Inc.
[53] Adv. Pro. 8:13-ap-893-MGW, Doc. 289.

In the sworn Supplemental Disclosure, Berman stated that the final amended pleading in the 893 Proceeding was largely drafted by the Probate Estates' attorney.[54]  In affirming two orders entered by this Court, the District Court described the pleading as a "'kitchen sink' of allegations spanning the better part of the last two decades and accusing virtually anyone who came in contact with the subject nursing homes of various, hyperbolic forms of misconduct."[55]  Despite its breadth, however, it does not appear that either Healthcare REIT or its predecessor, Monarch Properties, Inc., is mentioned in any of the 1,600 paragraphs of the pleading.[56]

A two-week trial was conducted in the 893 Proceeding in 2014.  At the conclusion of the trial, and after reviewing extensive deposition videos and transcripts in chambers, the Court announced tentative findings of fact and conclusions of law.  The Court prefaced its tentative findings by remarking on the discovery and litigation efforts by all parties:

> The trial followed almost three years of intense pretrial and discovery activity in which all of the parties participated, not only with respect to this adversary proceeding but other adversary proceedings that were consolidated with this case as well as substantial activity before this Court in the main case.
>
> In all, there were over 2,500 docket entries in the adversary proceedings that are before me today and in the main case, reflecting an enormous amount of activity by the parties and the Court in dealing with the numerous issues that have arisen.[57]

---

[54] Doc. 2150, ¶ 40.
[55] *Estate of Jackson v. Schron*, 2016 WL 4718145, at *6 (M.D. Fla.).
[56] Adv. Pro. 8:13-ap-893-MGW, Doc. 289.  *See* Doc. 2150, ¶ 41.
[57] Adv. Pro. 8:13-ap-893-MGW, Doc. 1019, p. 9.

Later, in an order related to a separate issue in the 893 Proceeding, the Court noted that the trial had involved more than 3,000 trial exhibits and nearly 100 hours of testimony, including video deposition testimony.[58] According to Shumaker, the parties had conducted approximately 55 days of depositions, and exchanged hundreds of thousands of pages of documents in discovery.[59]

Despite scores of hours of deposition testimony and thousands of exhibits developed through a joint discovery effort, the Probate Estates and the Trustee never considered Healthcare REIT as potentially liable to the bankruptcy estate because of any prepetition transactions.  In fact, the Probate Estates acknowledge that Healthcare REIT's existence and contact with THI appeared in deposition exhibits, Bates-stamped documents, and other discovery materials in the case.[60]  But Healthcare REIT never emerged from the materials as a potential target for recovery.  The March 2006 transaction, for example, was "front and center"[61] of the 893 Proceeding, but the joint investigation by the Trustee and the Probate Estates never revealed any potential claim against Healthcare REIT arising out of a connection with THI.

---

[58] *In re Fundamental Long Term Care, Inc.*, 569 B.R. 904, 916, n.30 (Bankr. M.D. Fla. 2016).
[59] Doc. 2172, p. 8.
[60] *See* Doc. 2153, pp. 9, 16.
[61] *In re Fundamental Long Term Care*, 569 B.R. at 907 n.6.

Years later, after the Probate Estates raised Shumaker's

representation of Healthcare REIT as an issue, the Trustee's general

counsel wrote that he had reviewed eighteen separate items sent by the

Probate Estates to show the alleged conflict:

> The involuntary petition was filed on December 5, 2011. Despite your knowledge that Healthcare REIT was a party to the Briar Hill suit for a short period of time, I have no records or recollection of Healthcare REIT being a topic of discussion (as a potential target or otherwise) in the bankruptcy case. Healthcare REIT was also not a creditor in the bankruptcy case, and did not appear to have any ongoing business or contact with the Debtor, Fundamental Long Term Care, Inc.  In fact, the first time Healthcare REIT was brought to our attention is when you raised Shumaker's alleged conflict of interest in or about September 2017, nearly 6 years after the involuntary petition had been filed.[62]

Based on his review of the documents sent by the Probate Estates, the

Trustee's general counsel did not "see how Healthcare REIT had any

relationship to the Debtor," and did not find a conflict created by

Shumaker's representation of Healthcare REIT.[63]

In summary, the Probate Estates allege that Healthcare REIT had

prepetition connections to THI that were not investigated in the bankruptcy

case because of Healthcare REIT's attorney-client relationship with

Shumaker.  But the prepetition transactions were the subject of exhaustive

joint discovery and litigation in multiple proceedings, and neither the

Probate Estates nor the Trustee ever considered Healthcare REIT as

---

[62] Ex. 1 to Doc. 2153, p. 1.
[63] Ex. 1 to Doc. 2153, p. 2.

potentially liable to the bankruptcy estate.  For these reasons, Shumaker's

representation of Healthcare REIT did not lessen the value of the

bankruptcy estate, create a potential dispute between the bankruptcy

estate and Healthcare REIT, or create a circumstance that would generate a

bias against the bankruptcy estate.[64]

### VI. Lyric

In the Disgorgement Motion, the Probate Estates allege that Lyric

Health Care, LLC and Lyric Health Care Holdings III, Inc. (together, Lyric)

were adversaries of the Probate Estates and that the Probate Estates had

uncovered connections between Shumaker and Lyric that affected

Shumaker's disinterestedness in the bankruptcy case.[65]

Healthcare REIT leased the property underlying the Auburndale

Oaks nursing facility to Lyric Health Care Holdings III, Inc. after

Healthcare REIT purchased the property in 2005, and Lyric thereafter

operated the nursing home facility.[66]  Healthcare REIT sold the property in

December 2012.[67]

Shumaker acknowledges that Lyric may have made payments to

Shumaker in relatively small amounts during Lyric's lease of the property.

According to Shumaker, however, any such payments represented

---

[64] *In re New River Dry Dock*, 497 Fed. Appx. at 886-87.
[65] Doc. 2153, pp. 26-27.
[66] Doc. 2150, ¶ 45; Doc. 2153, p. 4.
[67] Doc. 2150, ¶¶ 14-15.

compensation for work performed by Shumaker for its client, Healthcare REIT.  Shumaker's services were not provided to Lyric, and Lyric made the payments only pursuant to its obligations under the lease.[68]

Berman unequivocally states in the sworn Supplemental Disclosure that Lyric was never a client of Shumaker, and that a "search of [Shumaker's] conflict system shows that these entities [Lyric] were only adverse parties in corporate/real estate transactions involving Healthcare REIT."[69]

Additionally, Shumaker contends that Lyric was never a target of any litigation in the bankruptcy case,[70] even though the Lyric entities were known to the Probate Estates before the case was filed.[71]

In summary, the record shows that Shumaker did not serve as Lyric's attorney, and that its representation of Lyric's landlord did not create a disqualifying conflict of interest in the bankruptcy case.

**VII. HQM**

In the Disgorgement Motion, the Probate Estates allege that Home Quality Management, Inc. (HQM) is an adversary of two of the Probate

---

[68] Doc. 2150, ¶ 43; Doc. 2171, p. 9.
[69] Doc. 2150, ¶ 43.  Shumaker also states in its Memorandum in Opposition to the Disgorgement Motion that Lyric was never Shumaker's client, and that Shumaker did not represent both the landlord and the tenant in the real estate transactions.  (Doc. 2171, pp. 9, 11).
[70] Doc. 2150, ¶ 44; Doc. 2171, p. 9.
[71] According to Shumaker, four of the Probate Estates had sued Lyric in state court, but Lyric was dismissed from the actions with prejudice before the bankruptcy case was filed. (Doc. 2171, p. 10, n.8).  Additionally, Lyric is mentioned in the 893 Proceeding as having filed an action against THI in 2005.  (Doc. 2150, ¶ 46; Doc. 2153, pp. 23-24).

Estates, and that the Probate Estates had uncovered connections between Shumaker and HQM that affected Shumaker's disinterestedness in the bankruptcy case.[72]

HQM operates nursing homes in Florida pursuant to leases with Healthcare REIT as the owner of the real estate.[73]  Shumaker acknowledges that HQM may have made payments to the firm in 2005 and 2007.  But as with Lyric, Shumaker contends that any such payments were "for work performed on behalf of Shumaker's client Healthcare REIT, and was paid by HQM pursuant to contracts between Healthcare REIT (as landlord) and HQM (as tenant operator)."[74]

Additionally, as with Lyric, Shumaker asserts that Shumaker does not represent HQM and that HQM is not its client.[75]

Finally, HQM initially was a defendant in the state court actions brought by the Estate of Nunziata and the Estate of Webb, but was dismissed from the actions in 2009, two years before the filing of the bankruptcy case.[76]  HQM was never a target in the bankruptcy case, and does not appear in the complaint filed in the 893 Proceeding.[77]

---

[72] Doc. 2153, pp. 26-27.
[73] Doc. 2153, p. 4; Doc. 2171, pp. 11-12.
[74] Doc. 2153, p. 23; Doc. 2171, p. 12.
[75] Doc. 2171, pp. 11-12.
[76] Doc. 2153, p. 23; Doc. 2171, p. 12, n.11.
[77] Doc. 2171, p. 12; Doc. 2172, p. 8.

In summary, the record shows that Shumaker did not serve as HQM's attorney and that its representation of HQM's landlord did not create a disqualifying conflict of interest in the bankruptcy case.

## VIII. Conclusion

Section 327(a) of the Bankruptcy Code permits a trustee to employ an attorney who does not hold or represent an interest adverse to the estate, and who is disinterested.

Shumaker has represented Healthcare REIT for thirty years, and continues to represent Healthcare REIT in transactional matters.

Healthcare REIT is not adverse to the Probate Estates.  It was the owner of real property that it leased to the operators of the Auburndale Oaks nursing home, but was not involved in the operation of the nursing home, and was not a party to any lawsuits brought by the Probate Estates at the time that the bankruptcy case was filed.

Further, Healthcare REIT is not adverse to the bankruptcy estate. Despite exhaustive joint discovery, neither the Probate Estates nor the Trustee ever considered Healthcare REIT as potentially liable to the bankruptcy estate, either as a result of the March 2006 transaction or any other prepetition transaction.

Healthcare REIT was the owner of property that it leased to Lyric and HQM, but Shumaker never represented Lyric or HQM in an attorney/client relationship.

25

Based on the record, the Court finds that Shumaker's representation of Healthcare REIT did not lessen the value of the bankruptcy estate, create a potential dispute between the bankruptcy estate and Healthcare REIT, or create a circumstance that would generate a bias against the bankruptcy estate. The representation does not violate § 327(a) of the Bankruptcy Code.

Under Rule 2014 of the Federal Rules of Bankruptcy Procedure, an attorney employed by the trustee must disclose the attorney's connections with the debtor, creditors, and other parties in interest. The Rule's disclosure requirements are more encompassing than the disinterestedness inquiry under § 327(a), and compel the attorney to disclose all relevant connections that are not *de minimis*.[78]

Here, Shumaker represents Healthcare REIT in transactional matters. Healthcare REIT leased real property to nursing home operators, but did not contract or interact with the Debtor or a creditor of the bankruptcy estate. In the sworn Supplemental Disclosure, Berman stated:

> 12. At no time has [Shumaker] been aware of any relationship between Healthcare REIT and FLTCI or Trans Health Management, Inc. ("THMI").
>
> . . .
>
> 20. [Shumaker] did not represent Healthcare REIT in the Townsend litigation. As a result, when [Shumaker] ran its conflict checks both before and throughout its representation of the Chapter 7 Trustee, [Shumaker] did not find any client

---

[78] *In re Fullenkamp*, 477 B.R. at 834.

26

representation adverse to any of FLTCI's creditors, including the Townsend Estate.

. . .

39. To be clear, neither [Shumaker] nor the Chapter 7 Trustee knew that there was any connection whatsoever between the Townsend Estate and Healthcare REIT, nor was any connection ever disclosed by Mr. Wilkes prior to his 2017 discussions with the Chapter 7 Trustee, her counsel and the Office of the United States Trustee. . . .

. . .

48. Following Mr. Wilkes' 2017 inquiry to the Chapter 7 Trustee and the Office of the United States Trustee, [Shumaker] responded with a thorough explanation of the foregoing facts to the Chapter 7 Trustee and the Office of the United States Trustee, who then advised that they were comfortable with the additional disclosures and the facts did not raise any concerns.[79]

Shumaker's representation of Healthcare REIT was not adverse to the Probate Estates or to the bankruptcy estate. Further, there is no evidence that Shumaker was aware of any alleged connection between Healthcare REIT and the Probate Estates, or Healthcare REIT and the bankruptcy estate, before the Probate Estates raised the issue in 2017. In other words, this is not a situation in which Shumaker knew of the alleged connections and deliberately chose not to disclose them, or in which Shumaker's conflict check system was wholly inadequate.[80] Shumaker did

---

[79] Doc. 2150.
[80] *In re Fullenkamp*, 477 B.R. at 834.

not violate Rule 2014 by omitting its representation of Healthcare REIT from its initial disclosures.

Accordingly, it is

**ORDERED t**hat the Probate Estates' Motion to Disqualify Steven M. Berman, Esquire and Shumaker, Loop & Kendrick, LLP as Counsel to the Chapter 7 Trustee Nunc Pro Tunc and for Disgorgement of Compensation is DENIED.

> Attorney Steven M. Berman is directed to serve a copy of this Order on interested parties who are non-CM/ECF users and file a proof of service within 3 days of entry of the Order.